# Syllabus

Chief Justice:
Elizabeth T. Clement

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

MOTHERING JUSTICE v ATTORNEY GENERAL

Docket No. 165325. Argued December 7, 2023 (Calendar No. 1). Decided July 31, 2024.

Mothering Justice, Michigan One Fair Wage, Michigan Time to Care, and others brought an action in the Court of Claims against Michigan Attorney General Dana Nessel, in her official capacity, challenging the Legislature's actions concerning initiative petitions those groups submitted to the Legislature, which the Legislature adopted and then amended within the same legislative session (adopt-and-amend). Michigan One Fair Wage and Michigan Time to Care sponsored proposals known respectively as the Improved Workforce Opportunity Wage Act (the Wage Act) and the Earned Sick Time Act; the groups collected the requisite number of voter signatures on their petitions, and as required by MCL 168.471, they filed the petitions with the Secretary of State in 2018. The Secretary of State notified the Board of State Canvassers of the petitions, as required by MCL 168.475(1). After the board canvassed the petitions and the proposals were submitted to the Legislature, pursuant to Const 1963, art 2, § 9, the Legislature adopted the proposed acts without change or amendment on September 5, 2018, as 2018 PA 337 and 2018 PA 338. Because the Legislature adopted the initiatives unaltered, neither of the proposed laws appeared on the ballot in 2018.

After the 2018 elections, at the request of a member of the Michigan Senate to address whether Const 1963, art 2, § 9 allowed the Legislature to adopt and amend an initiative proposal in the same legislative session, then Attorney General Bill Schuette issued an opinion, OAG, 2017-2018, No. 7,306, p 85 (December 3, 2018), stating that the Legislature could do so; the opinion contradicted an opinion drafted in 1964 by then Attorney General Frank Kelley, OAG, 1963-1964, No. 4,303, p 309 (March 6, 1964). After receiving Attorney General Schuette's opinion, the Legislature significantly amended the proposals during the lame duck session with a simple majority vote, and the Governor signed the legislation—2018 PA 368 and 2018 PA 369—into law, with an effective date of March 29, 2019. In 2019, the Legislature sought an advisory opinion from the Supreme Court regarding the constitutionality of 2018 PA 368 and 2018 PA 369, but the Court denied the request. *In re House of Representatives Request for Advisory Opinion Regarding Constitutionality of 2018 PA 368 & 369*, 505 Mich 884 (2019).

Plaintiffs then brought this action, asserting in their complaint that 2018 PA 368 and 2018 PA 369 were unconstitutional under Article 2, § 9 and that, as a result, 2018 PA 337 and 2018 PA 338 were still in effect. Because the Attorney General agreed with plaintiffs on the substantive

issues, the Court of Claims ordered plaintiffs to amend their complaint to add the state of Michigan as a defendant (i.e., as the party defending the Legislature's actions) and to indicate that the Attorney General was a named defendant solely as a representative of the state. Plaintiffs and the Attorney General moved for summary disposition, arguing that Article 2, § 9 did not allow the Legislature to adopt and amend an initiative proposal in the same legislative session. The Attorney General further asserted that 2018 PA 337 and 2018 PA 338 would be in full effect if the amended acts were declared unconstitutional. In turn, the state moved for summary disposition, arguing that the Constitution did not preclude the Legislature from adopting and amending an initiative proposal in the same legislative session. The Court of Claims, DOUGLAS P. SHAPIRO, J., granted summary disposition in favor of plaintiffs and the Attorney General. In so doing, the court reasoned that Article 2, § 9, which outlines three options the Legislature can take during the first 40 session days after receiving an initiative petition, does not grant the Legislature the right to adopt and amend an initiative proposal in the same legislative session. The court ruled that 2018 PA 368 and 2018 PA 369 were void because they unconstitutionally amended the initiatives the Legislature had adopted, held that 2018 PA 337 and 2018 PA 338 therefore remained in effect, and rendered judgment in favor of plaintiffs. The state appealed, and the Court of Appeals, in a lead opinion by MURRAY, J., and separate concurring opinions by M. J. KELLY, P.J., and RIORDAN, J., reversed, holding that because the Constitution did not expressly prohibit the Legislature from adopting and amending an initiative proposal in the same legislative session, the Legislature was free to do so. 345 Mich App 282 (2023). Plaintiffs sought leave to appeal in the Supreme Court, and the Attorney General cross-appealed. The Supreme Court granted plaintiffs' application. 511 Mich 994 (2023). The Supreme Court denied the cross-appeal as moot.

In an opinion by Justice WELCH, joined by Justices BERNSTEIN, CAVANAGH, and BOLDEN, the Supreme Court *held*:

Article 2, § 9 of the 1963 Michigan Constitution provides the Legislature with three—and only three—options upon receiving a valid initiative petition. The Legislature may not adopt an initiative petition and then later amend it in the same legislative session; such an act violates the people's right to propose and enact laws through the initiative process under Const 1963, art 2, § 9. Accordingly, 2018 PA 368 and 2018 PA 369 were unconstitutional. Because 2018 PA 337 and 2018 PA 338 would have gone into effect 205 days after their enactment, 2018 PA 337 and 2018 PA 338 will go into effect 205 days after July 31, 2024, the issuance date of the Court's opinion, with a revised schedule that links the gradual phase-in of minimum-wage increases to the same annual schedule as originally proposed, but set into the future, and accounting for inflation. This remedy revives the constitutional status quo while accounting for the passage of time. Accordingly, the Wage Act and the Earned Sick Time Act will go into effect on February 21, 2025.

1. Under Const 1963, art 4, § 1, most lawmaking power is vested in the Legislature. However, under Const 1963, art 2, § 9, the people reserved to themselves the power to propose laws and to enact laws, called the initiative. To invoke the initiative, those who desire to enact a certain law must gather signatures showing that Michigan voters support the proposed law. If supporters collect enough signatures, then the initiative is invoked, and the proposed law proceeds to the Legislature. The Legislature must then make one of three choices regarding the proposed law. First, it can enact the law "without change or amendment" within 40 days. Second, it can reject the proposed law, in which case the proposed law will appear on the ballot in the next general

election. Or third, the Legislature may reject any measure proposed by the initiative petition and propose a different measure upon the same subject as the initiative petition. If the Legislature chooses the third option, both the original proposal and the version as modified by the Legislature will appear on the ballot of the next general election alongside one another.

2. The plain text of Article 2, § 9 does not allow the Legislature to reject an initiative without the voters' approval. First, interpreting Article 2, § 9 to allow adopt-and-amend would render elements of § 9 surplusage. Second, the canons of constitutional construction dictate that the text's original meaning to the ratifiers, the people, at the time of ratification, be considered, and in this case, it was implausible that the ratifiers understood their inclusion of three discrete options for the Legislature allowed for a contradictory fourth option. Third, to the extent that Article 2, § 9 is ambiguous, the provision must be liberally construed in favor of the people. Construing Article 2, § 9 in favor of the people meant that the Legislature could not be allowed to sidestep the people's reserved power. Finally, the Court had to examine whether the law constituted an undue burden on voters' exercise of their direct-democracy rights; here, the Legislature obstructed voters' ability to exercise their direct-democracy rights through the initiative process when it passed the amended acts. Accordingly, the Legislature unduly burdened voters' direct-democracy rights through the adopt-and-amend process. 2018 PA 368 and 2018 PA 369 were unconstitutional.

3. The history of the initiative power in Michigan informed the holding that adopt-and-amend was unconstitutional. Until 1908, Michigan did not allow initiatives or referenda in any capacity. Michigan voters added the constitutional provision allowing for initiative provisions to make the government more responsive to the people. By allowing for citizen petitions, the people clawed back from the Legislature the right of the people to initiate legislation. Moreover, contemporaneous observers understood that adopt-and-amend was impermissible, including Attorney General Kelley, who issued an opinion on the subject. The record of the constitutional convention also supported this holding.

4. *Mich Farm Bureau v Secretary of State*, 379 Mich 387 (1967), which held that an adopt-and-repeal scheme violated Article 2, § 9, was instructive, and the same analysis applied to the adopt-and-amend scheme. *Kuhn v Dep't of Treasury*, 384 Mich 378 (1971), which held that the phrase "deficiencies in state funds" in Article 2, § 9 referred only to such deficiencies as existed at the time of passage of the act in question, also informed the analysis. In that case, the Court explained that "constitutional provisions by which the people reserve to themselves a direct legislative voice ought to be liberally construed." The *Kuhn* Court was tasked with interpreting the Constitution's silence, and as in *Kuhn*, in this case that silence was construed liberally in favor of the people's reserved powers.

5. The Legislature was not free to adopt and amend an initiative proposal in the same legislative session just because the Constitution does not expressly prohibit adopt-and-amend. That argument conflicted with *Mich Farm Bureau*. Moreover, to the extent that the Legislature's lawmaking power is plenary under Article 4, that power did not apply to the initiative, which is a right reserved to the people. By reserving the initiative power to the people, the Constitution limits the Legislature's role with respect to initiatives to the powers expressly conferred upon it. If a

Legislature adopts an initiative into law, it may amend the law during subsequent legislative sessions.

6. The general rule of statutory interpretation is that an unconstitutional statute is void *ab initio*. However, where injustice might result from full retroactivity, a more flexible approach is used, giving holdings limited retroactive or prospective effect. Relatedly, courts possess broad equitable powers to right statutory and constitutional wrongs, and those powers are defined by pragmatic flexibility. The remedy in this case had to be shaped by a practical flexibility that reconciled employers' reasonable needs and expectations with the people's rights to the initiative. Accordingly, the original initiatives, as adopted by the Legislature—2018 PA 337 and 2018 PA 338—remained in place. 2018 PA 337 and 2018 PA 338 provided stakeholders with 205 days between the laws' enactment and their effective dates; that transition time would provide employers with time to prepare to comply with the new laws. Because this was the time period that would have been required, 2018 PA 337 and 2018 PA 338 were ordered to go back into effect 205 days after July 31, 2024, the publication date of this opinion. Finally, employers cannot be held liable for their reasonable reliance on the state government's assurances that 2018 PA 368 and 2018 PA 369 were good law. In determining how to apply the Wage Act provisions that were set to phase in over time, because 2018 PA 337 and 2018 PA 338 established a gradual phase-in of the minimum-wage increases, the appropriate remedy in this case was to incorporate gradual increases on a similar time line. Accordingly, adoption of a remedy that linked wage increases to the same annual schedule as originally proposed, but set into the future, starting on the effective date of this opinion, was appropriate. The minimum-wage increases were ordered to go into effect 205 days after July 31, 2024, as if that day were January 1, 2019. Finally, to account for inflation, the state treasurer was instructed to use July 31, 2024, to calculate the inflation-adjusted rates for the minimum hourly wage prescriptions provided in the Wage Act. This remedy revived the constitutional status quo while accounting for the passage of time.

Court of Appeals judgment reversed; 2018 PA 368 and 2018 PA 369 declared unconstitutional; 2018 PA 337 and 2018 PA 338 ordered to go back into effect 205 days after July 31, 2024, with the revised schedule outlined in this opinion.

Justice BOLDEN, concurring, joined the majority opinion in full to hold that 2018 PA 368 and 2018 PA 369 were unconstitutional because they amended ballot initiatives that had been adopted into law within the same legislative session, an act that was not included in the three options provided to the Legislature under the initiative clause of the Michigan Constitution. She wrote separately to express her disappointment that no remedy existed through which the Court could provide the voters with the constitutional guarantees of the initiative clause by placing this matter on the ballot for a general election.

Chief Justice CLEMENT, joined by Justices ZAHRA and VIVIANO, dissenting, would have affirmed the Court of Appeals judgment because the Legislature's power under Const 1963, art 4, § 1 is limited only if the Constitution expressly says so. And Const 1963, art 2, § 9 is silent about whether the Legislature may amend a law proposed by initiative petition in the same session that the Legislature has enacted it. While Article 2, § 9 requires the Legislature to enact or reject a law proposed by initiative petition "without change or amendment" and Article 2, § 9 requires the proposed law to go on the ballot if the Legislature rejects it, Article 2, § 9 requires this only during

the 40 session days after the Legislature receives an initiative petition. Just as the Legislature may alter, amend, and repeal laws that were enacted through the usual enactment and presentment process, it may do the same to initiated laws it has enacted in the absence of any constitutional provision explicitly prohibiting such action. *Mich Farm Bureau* and *Kuhn* stood for the proposition that when the text of Article 2, § 9 is unclear, courts will interpret it to inhibit the Legislature from preventing the people from exercising their right to refer laws and—by extension—to initiate laws. But Article 2, § 9 was not unclear in this instance, and so this proposition was irrelevant in this case. The majority identified nothing in the text of Article 2, § 9 that could be reasonably understood as saying or implying that the Legislature cannot amend a proposed initiated law it has enacted in the same legislative session; accordingly, there was nothing in Article 2, § 9 to liberally construe. Moreover, interpreting Article 2, § 9 as allowing the Legislature to amend a previously enacted initiated law does not allow the Legislature to completely deprive the people of their right to initiate a specific law or laws on a particular subject matter, nor to express their will with regard to those laws. It was not inconceivable to think that the people intended to allow the Legislature to amend a law proposed by initiative petition in the same legislative session the Legislature enacts it; by leaving the Legislature free to do so, the people likely understood that the Legislature would be able to amend the law in a way that promotes its underlying purpose, fills gaps overlooked by the law's sponsors, or corrects serious typographical errors. Finally, the constitutional convention record suggested that the delegates—the people's representatives—were fully aware that Article 2, § 9 would not restrict the Legislature from amending an initiated law previously enacted by it. The Legislature was allowed to amend the Wage Act and the Earned Sick Time Act in the same legislative session.

Justice ZAHRA, joined by Chief Justice CLEMENT and Justice VIVIANO, dissenting, would have held that adopting and amending the initiative petitions within the same legislative session was constitutionally permissible and that the remedy the majority chose—abrogating 2018 PA 368 and 2018 PA 369 and reviving the substance of 2018 PA 337 and 2018 PA 338 with judge-made statutory revisions—improperly encroached on the authority constitutionally provided to the Legislature. The majority abrogated the amendments enacted by the Legislature and signed by the Governor, revived initiative petitions that were rejected by the Legislature and never approved by the voters, and rewrote the initiative language in a manner that was not even proposed by the initiative petitioners. Such a remedy has never been used or condoned in the history of Michigan jurisprudence, and it amounted to an exercise of legislative power that is not vested with the judiciary under the Michigan Constitution. Reviving previous versions of the statutes at issue that are no longer in effect conflicts with the Legislature's clear intent; there was no indication that the Legislature intended the terms of the initiative to be revived if the subsequent amendments were determined to be unconstitutionally enacted. Reviving 2018 PA 337 and 2018 PA 338 would fundamentally alter the labor relationship between tipped employees, their employers, and customers, and reviving these laws would also create a significantly different entitlement to sick leave that workers could seek from their employers. The majority opinion ignored the Legislature's intent, but it failed to cite caselaw support for the application of revival, let alone a wholesale rewrite of a statute, based solely on the purported intent and purposes of a statute or law that was replaced. Furthermore, a complete review of the complexity, alterations, and exceptions created by the Legislature's amendments of the initiative provisions strongly supported the notion that the Legislature would have preferred a version of the minimum-wage law that existed prior to the initiative, rather than the initiative itself. In sum, there was no indication that the Legislature

intended the terms of the initiative to be revived upon a determination by this Court that their subsequent amendments were unconstitutionally enacted; furthermore, there was no legal authority for this Court to rewrite unambiguous statutory language. Instead, upon a declaration that the amendments were unconstitutional, the question of how to best remedy the unconstitutional legislative action should have been turned over to the people and their elected representatives. And if the majority insisted on taking an exceedingly broad and expansive view of its authority, it should have used that authority to allow the proposed initiative to proceed onto the ballot for consideration by the voters. That is, the Legislature's substantial amendment and replacement of the initiative's provisions could have been construed as a rejection of that initiative proposal, and the initiative proposal then could have been placed on the ballot as if the Legislature had chosen not to adopt it. In doing so, Michigan voters would have had their constitutional rights to direct democracy vindicated, deciding for themselves the significant questions of economic and social policy implicated in the initiative proposal.

# OPINION

Chief Justice:
   Elizabeth T. Clement

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden

FILED July 31, 2024

STATE OF MICHIGAN

SUPREME COURT

MOTHERING JUSTICE, MICHIGAN ONE
FAIR WAGE, MICHIGAN TIME TO
CARE, RESTAURANT OPPORTUNITIES
CENTER OF MICHIGAN, JAMES HAWK,
and TIA MARIE SANDERS,

       Plaintiffs-Appellants/
       Cross-Appellees,

v                                 No. 165325

ATTORNEY GENERAL,

       Defendant-Appellee/
       Cross-Appellant,

and

STATE OF MICHIGAN,

       Defendant-Appellee.

---

BEFORE THE ENTIRE BENCH

WELCH, J.

In 2018, the Legislature received initiative petitions that proposed raising Michigan's minimum wage, allowing for compensatory time in lieu of overtime, and providing paid sick leave to employees. Under Michigan's Constitution, the Legislature could vote to adopt the initiatives as presented, reject the initiatives but place them on the general election ballot, or propose alternatives to the initiatives' proposed language and place both the alternative and original proposals on the general election ballot. Const 1963, art 2, § 9. After receiving the petitions, the Legislature voted in September 2018 to adopt both into law. See 2018 PA 337 and 2018 PA 338.

But following the November 2018 general election, the lame duck Legislature voted to amend the laws in a manner that dramatically altered and virtually eliminated the changes voters sought through the initiative process. See 2018 PA 368 and 2018 PA 369. We hold that this decision to adopt the initiatives and then later amend them in the same legislative session (what has been referred to as "adopt-and-amend") violated the people's constitutionally guaranteed right to propose and enact laws through the initiative process. We therefore reverse the Court of Appeals' judgment and reinstate 2018 PA 337 and 2018 PA 338 as set forth in this opinion.[1]

## I. BACKGROUND

### A. THE PEOPLE'S CONSTITUTIONAL RIGHT TO THE INITIATIVE

Michigan's Constitution vests most lawmaking power in the Legislature. Const 1963, art 4, § 1. However, "[t]he people reserve[d] to themselves the power to propose

---

[1] The Attorney General applied for leave to appeal as cross-appellant. Because that application seeks the same relief as that sought by plaintiffs, which this Court largely grants, the application for leave to appeal as cross-appellant is denied as moot.

laws and to enact and reject laws, called the initiative . . . ."[2]  Const 1963, art 2, § 9.  To

invoke the initiative, those who desire to enact a certain law must gather signatures showing

that Michigan voters support the proposed law.  *Id*.  If supporters collect enough

signatures—specifically, an amount of 8% or more of the votes cast in the most recent

general gubernatorial election—then the initiative is invoked, and the proposed law moves

on to the next stage of the lawmaking process.  *Id*.

At the next stage, the proposed law proceeds to the Legislature.  *Id*.  The Legislature

must then make one of three choices regarding the proposed law.  *Id*.  First, it can enact the

law "without change or amendment" within 40 days.  *Id*.  Second, it can reject the proposed

law, in which case the proposed law will appear on the ballot in the next general election.

*Id*.  Or third, the Legislature may reject any measure proposed by the initiative petition and

propose a different measure upon the same subject as included in the initial initiative

petition.  *Id*.  If the Legislature chooses the third option, both the original proposal and the

version as modified by the Legislature will appear on the ballot of the next general election

alongside one another.[3]  *Id*.

---

[2] As we discuss later in this opinion, Article 2, § 9 also concerns "the power to approve or reject laws enacted by the legislature, called the referendum."

[3] As is relevant here, the Constitution provides:

> Any law proposed by initiative petition shall be either enacted or rejected by the legislature without change or amendment within 40 session days from the time such petition is received by the legislature.  If any law proposed by such petition shall be enacted by the legislature it shall be subject to referendum, as hereinafter provided.

> If the law so proposed is not enacted by the legislature within the 40 days, the state officer authorized by law shall submit such proposed law to the people for approval or rejection at the next general election.  The

Laws enacted through the initiative process have special protection. For example, the governor may not veto a law passed through any of these three methods. Moreover, if the Legislature chooses either the second or third option, and if a majority of Michigan voters approve a proposed law during the general election, then that law can be amended only by a vote of $^3/_4$ of the Legislature. *Id*.

## B. THE INITIATIVE PETITIONS

This case involves two proposed laws that supporters sought to introduce through initiative petitions. The first petition, known as the Improved Workforce Opportunity Wage Act (the Wage Act), proposed significant changes to Michigan's minimum wage and overtime laws. It would have increased the Michigan minimum wage from $9.25 to $10.00 per hour in 2019 and would have mandated in subsequent years that the minimum wage increase to the following levels: $10.65 in 2020, $11.35 in 2021, and $12.00 in 2022. After the 2022 increase, the Wage Act would have directed the state treasurer to increase the

legislature may reject any measure so proposed by initiative petition and propose a different measure upon the same subject by a yea and nay vote upon separate roll calls, and in such event both measures shall be submitted by such state officer to the electors for approval or rejection at the next general election.

Any law submitted to the people by either initiative or referendum petition and approved by a majority of the votes cast thereon at any election shall take effect 10 days after the date of the official declaration of the vote. No law initiated or adopted by the people shall be subject to the veto power of the governor, and no law adopted by the people at the polls under the initiative provisions of this section shall be amended or repealed, except by a vote of the electors unless otherwise provided in the initiative measure or by three-fourths of the members elected to and serving in each house of the legislature. [Const 1963, art 2, § 9.]

4

minimum wage according to inflation.[4]   The Wage Act would also have raised the minimum wage for tipped employees, such as restaurant servers.  Before the Wage Act, the minimum wage for tipped employees was a fixed percentage of the general minimum wage.  In 2018, for example, the minimum wage for tipped employees was 38% of the general minimum wage.  Under the Wage Act, this percentage would have been raised incrementally each year until it reached 100% of the minimum wage in 2024.[5]  After 2022, moreover, the minimum wage for both tipped and non-tipped employees would have increased each year in accordance with inflation.

The Wage Act would also have allowed employees to accrue 1.5 hours of paid time off for every hour of overtime worked in lieu of compensation (often referred to as "comp time"), up to a maximum of 240 hours.  Employees would have been able to use these hours for any purpose.  Moreover, under the Wage Act, if employees later desired to

---

[4] Specifically, the Wage Act would have directed the state treasurer as follows:

> The increase shall be calculated by multiplying the otherwise applicable minimum wage by the 12-month percentage increase, if any, in the consumer price index for urban wage earners and clerical workers, CPI-W, or a successor index, as published by the bureau of labor statistics of the United States department of labor, based upon the most recent 12-month period for which data are available.  The adjusted minimum wage rate shall be published by November 1 of the year it is calculated and shall be effective beginning January 1 of the succeeding year.  [2018 PA 337, § 4(2).]

The Wage Act paused such increases if unemployment in Michigan was 8.5% or greater for the preceding year.  2018 PA 337, § 4(3).

[5] Under the Wage Act, the minimum wage for tipped employees would have been raised to 48% of the general minimum wage in 2019, 60% in 2020, 70% in 2021, 80% in 2022, 90% in 2023, and 100% in 2024.

convert the hours back into compensation, they could do so at the same wage that they were earning when the hours were accrued.

The second initiative petition introduced in 2018 that is relevant to this case was titled the Earned Sick Time Act. This act required employers to grant employees 1 hour of paid sick time for every 30 hours worked each week, subject to certain maximums per year. It also stipulated that employees could use those hours for any issue relating to physical or mental health, whether their own or that of a family member. Moreover, if the employee or anyone in the employee's family was a victim of domestic violence or sexual assault, the accrued sick time could be used to address issues relating to that violence or assault, such as attending counseling appointments, court proceedings, or school visits. Finally, the Earned Sick Time Act specified that the same time-measurement increments used to determine the number of hours an employee worked each week had to be used when measuring the amount of earned sick time the employee used during a particular absence from work. Although the act did allow employers to require reasonable supporting documentation when absences exceeded three days, it generally prohibited employers from interfering with an employee's attempt to use the accrued sick time.

C. THE LEGISLATURE ADOPTS AND AMENDS THE INITIATIVES

In the run-up to the 2018 election, the groups sponsoring both the Wage Act and the Earned Sick Time Act secured enough signatures to send the petitions to the Legislature. Both initiatives were largely expected to pass if placed on the ballot.[6] Rather than have the

---

[6] See, e.g., Oosting, *Michigan Republicans Weigh Fate of Minimum Wage Hike, Paid Sick Leave Proposals*, Detroit News (August 29, 2018), available at <https://www.detroitnews.com/story/news/local/michigan/2018/08/29/michigan-republicans-consider-minimum-wage-paid-leave/1120676002/> [https://perma.cc/ATV5-XXUA];

voters decide the issue, the Legislature opted to adopt both initiatives "without change or amendment."[7] Const 1963, art 2, § 9; see 2018 PA 337 and 2018 PA 338. Because the Legislature adopted the initiatives unaltered, neither of the proposed laws appeared on the ballot in 2018. After the election was over, however, the Legislature voted by a simple majority to amend both laws significantly and to strip away many of their defining features.[8] See 2018 PA 368 (the Amended Wage Act) and 2018 PA 369 (the Amended Earned Sick Time Act).

---

Gray, *Michigan's OK of Minimum Wage Hike, Paid Sick Leave Has a Big Catch*, Detroit Free Press (September 7, 2018), available at <https://www.freep.com/story/news/politics/2018/09/07/minimum-wage-hike-paid-sick-leave-celebrations-would-premature/1216457002/> [https://perma.cc/5U7Z-2E9A]; Kurlyandchik, *A Fight Is Brewing in Michigan Over Restaurant Tips*, Detroit Free Press (June 8, 2018), available at <https://www.freep.com/story/entertainment/dining/mark-kurlyandchik/2018/06/08/restaurant-tips-michigan-ballot-one-fair-wage-roc/682109002/> [https://perma.cc/A547-ZBUV].

[7] See Oosting & LeBlanc, *Michigan GOP Lawmakers Adopt Minimum Wage, Sick Leave Plans with Aim To Amend*, Detroit News (September 5, 2018), available at <https://www.detroitnews.com/story/news/local/michigan/2018/09/05/michigan-legislature-wage-sick-leave-initiatives/1201948002/> [https://perma.cc/2DEV-NC3T]; Eggert, *Michigan Legislature OKs Gutting Wage, Paid Sick Time Laws*, Associated Press (December 4, 2018), available at <https://apnews.com/michigan-legislature-oks-gutting-wage-paid-sick-time-laws-c0f3286e8edb4cce8185013978a84d76> [https://perma.cc/R94R-Z8X9].

[8] In a concurring opinion, Court of Appeals Judge M. J. KELLY commented on this scheme:

> [T]his ploy—adopting an initiative into law so as to prevent it from going onto the ballot and then promptly and substantially amending that law in a manner that has left it essentially defanged—is anti-democratic. I cannot believe that this drastic action is what the drafters of our Constitution even contemplated, let alone intended.
>
> If the individuals responsible for this maneuver ever wonder why public opinion polls consistently cast politicians low when it comes to the virtue of trust, they need look no further than what they did here. It is a direct

7

For example, under the Amended Wage Act, the minimum wage for tipped employees remained at 38%, MCL 408.934d; the inflation-pegged annual increases to the minimum wage were replaced by a $0.23 per year increase, MCL 408.934; and the minimum wage was not set to exceed $12.00 until 2030, *id*. Similarly, the Amended Earned Sick Time Act made the act applicable only to employers who employ more than 50 people, MCL 408.962(f); it only required an employer to allow employees to use 40 hours of sick time each year, MCL 408.963(2); and it specified that paid sick time must be used in one-hour increments, MCL 408.964(3).

It is undisputed that, under the Michigan Constitution, the Legislature would not have been able to make these amendments by a simple majority vote if the initiatives had appeared on the ballot and had been approved by a majority of Michigan voters in the 2018 election. Const 1963, art 2, § 9. If that had happened, then the laws could only have been amended by a vote of $^3/_4$ of the Legislature. *Id*. The Legislature, however, did not choose to allow the proposed laws to appear on the ballot. Nor did it propose alternatives to the proposed laws, which would have then been placed on the ballot alongside the proposed laws. See *id*. Rather, it chose a path not set forth in the Constitution: it adopted the proposed laws as written on the initiative petitions and then amended those laws as soon as the election was over.

---

assault on one of the rights our founding fathers and the drafters of our state Constitution held dear: the right of the citizens to petition their government.

When the history of this Legislature is written, it is difficult to imagine anybody saying that this was their finest hour. [*Mothering Justice v Attorney General*, 345 Mich App 282, 323; 5 NW3d 54 (2023) (M. J. KELLY, P.J., concurring).]

## D. LOWER COURT PROCEEDINGS

Plaintiffs commenced this action in the Court of Claims, asserting that adopt-and-amend is an unconstitutional infringement on the people's initiative power. Through their amended complaint, plaintiffs asserted that the Amended Wage Act and the Amended Earned Sick Time Act were unconstitutional under Const 1963, art 2, § 9 and that the Wage Act and the Earned Sick Time Act remain in effect as originally adopted by the Legislature prior to the amendments. Initially, the Attorney General was the only defendant. Because the Attorney General agreed with plaintiffs on the substantive issues, however, the Court of Claims ordered plaintiffs to amend their complaint to add the state of Michigan (the State) as a defendant (i.e., as the party defending the Legislature's actions) and to indicate that the Attorney General is a named defendant solely as a representative of the State. Plaintiffs amended their complaint in accordance with that order.

Plaintiffs and the Attorney General moved for summary disposition on the basis that Article 2, § 9 did not permit the Legislature to adopt a proposed initiative and amend it within the same legislative session because allowing it to do so would be contrary to the common understanding of the Michigan Constitution. The Attorney General further argued that if the Amended Wage Act and the Amended Earned Sick Time Act were declared unconstitutional, then the Wage Act and the Earned Sick Time Act would remain in full effect as initially adopted. The State, in contrast, sought judgment in its favor on the basis that the Constitution did not preclude the Legislature from amending a voter-initiated law in the same session in which the Legislature approved it.

The Court of Claims held that the Legislature's adopt-and-amend approach was unconstitutional and that the voter-initiated laws remained in effect. In short, the Court of

9

Claims reasoned that our Constitution provides the Legislature with three possible responses upon receiving a valid initiative petition and that the Legislature could not sidestep the people's initiative power by crafting a fourth option. Although the Court of Claims denied the State's motion to stay its decision pending appeal, the Court of Claims did grant a stay of 205 days.

Before the stay expired, the Court of Appeals reversed and remanded for entry of an order granting summary disposition to the State. *Mothering Justice v Attorney General*, 345 Mich App 282, 323; 5 NW3d 54 (2023) (opinion by MURRAY, J.). The panel premised its holding upon the fact that "[u]nlike the federal Constitution, which contains specific and limited delegations of power to Congress, under our state Constitution the Legislature has all legislative power unless specifically limited by the state or federal Constitutions." *Id*. at 298.[9] Absent specific and express prohibitions, the panel reasoned, the Legislature can legislate as it sees fit. Accordingly, the panel held that because the Constitution does not expressly prohibit amending an initiative that it adopted in the same session, the Legislature was free to do so. This appeal followed.

## II. STANDARD OF REVIEW

We review de novo questions of constitutional law. See *People v Parks*, 510 Mich 225, 245; 987 NW2d 161 (2022). "Moreover, we alone are 'the ultimate authority with

---

[9] Although only Judge MURRAY signed the lead opinion, Judge RIORDAN concurred separately and joined the lead opinion in full, *Mothering Justice*, 345 Mich App at 324; Judge M. J. KELLY also concurred separately, agreeing that the adopt-and-amend procedure did not violate the state Constitution, *id*. at 323.

regard to the meaning and application of Michigan law.' " *Id*., quoting *People v Bullock*, 440 Mich 15, 27; 485 NW2d 866 (1992).

When interpreting our Constitution, this Court's " 'primary objective . . . is to realize the intent of the people by whom and for whom the constitution was ratified.' " *Paquin v City of St Ignace*, 504 Mich 124, 129; 934 NW2d 650 (2019), quoting *Studier v Mich Pub Sch Employees' Retirement Bd*, 472 Mich 642, 652; 698 NW2d 350 (2005). Accordingly, we seek "to determine the text's original meaning to the ratifiers, the people, at the time of ratification." *Citizens Protecting Michigan's Constitution v Secretary of State*, 503 Mich 42, 61; 921 NW2d 247 (2018) (quotation marks and citation omitted). To do so, we must consider " 'the circumstances leading to the adoption of the provision and the purpose sought to be accomplished.' " *People v Tanner*, 496 Mich 199, 226; 853 NW2d 653 (2014), quoting *People v Nash*, 418 Mich 196, 209; 341 NW2d 439 (1983) (opinion by BRICKLEY, J.). "To help discover the common understanding, this Court has observed that constitutional convention debates and the address to the people, though not controlling, are relevant." *Citizens Protecting Michigan's Constitution*, 503 Mich at 61 (quotation marks and citation omitted).

In examining whether legislation is permissible under Article 2, § 9, this Court must determine "whether a particular law constitutes an 'undue burden' on voters' exercise of their direct-democracy rights." *League of Women Voters of Mich v Secretary of State*, 508 Mich 520, 541; 975 NW2d 840 (2022). In this case, therefore, we must consider whether the Legislature unduly burdened voters' direct democracy rights when it passed the Amended Wage Act and the Amended Earned Sick Time Act. See *id*.

11

## III. ANALYSIS

## A. WHETHER ADOPT-AND-AMEND IS CONSTITUTIONAL

Our Constitution provides that "[a]ll political power is inherent in the people." Const 1963, art 1, § 1. In other words, the people bestow power unto the branches of government, not the other way around. *Id*. It is in that context that "[t]he people reserve *to themselves*," rather than to the Legislature, "the power to propose laws and to enact and reject laws" through the initiative process. Const 1963, art 2, § 9 (emphasis added). Thus, "[a]rt 2, § 9, is a reservation of legislative authority which serves as a limitation on the powers of the Legislature. This reservation of power is constitutionally protected from government infringement once invoked[.]" *Woodland v Mich Citizens Lobby*, 423 Mich 188, 215; 378 NW2d 337 (1985).

With respect to constitutional interpretation, where, as here, "the people reserve to themselves a direct legislative voice," this Court must "liberally construe[]" such provisions in favor of the people. *Kuhn v Dep't of Treasury*, 384 Mich 378, 385; 183 NW2d 796 (1971). To that end, the Legislature may not evade, parry, or "thwart" the people's Article 2, § 9 powers. *Mich Farm Bureau v Secretary of State*, 379 Mich 387, 393-395; 151 NW2d 797 (1967). Article 2, § 9 reflects our Constitution's commitment to "the democracy principle." See Bulman-Pozen & Seifter, *The Democracy Principle in State Constitutions*, 119 Mich L Rev 859, 861 (2021) ("In text, history, and structure" state constitutions such as Michigan's "privilege 'rule by the people,' and especially rule by popular majorities.").[10]

---

[10] The democracy principle is a helpful tool to analyze our laws—especially those statutes and constitutional provisions that implicate elections and direct democracy. As is relevant to this case, "[t]he democracy principle can . . . shed new light on the relationship between

12

## 1. TEXT AND STRUCTURE OF ARTICLE 2, § 9

The Constitution's plain text provides the Legislature with three discrete options upon receiving a valid initiative petition. Const 1963, art 2, § 9. The two options through which the Legislature rejects an initiative *require* the issue to then go directly to voters. *Id*. The third option—adoption—is the only option that does not require voters to decide the matter directly. *Id*. Thus, the plain text of Article 2, § 9 makes clear that the Legislature cannot reject or alter an initiative without the voters' approval. We hold that the text unambiguously provides the Legislature with only three options when presented with a valid initiative petition.

The canons of constitutional construction inform our holding. First, interpreting Article 2, § 9 to allow adopt-and-amend would render elements of § 9 surplusage. See *Paquin*, 504 Mich at 133 (applying the canon against surplusage to constitutional construction); *Richardson v Secretary of State*, 381 Mich 304, 313; 160 NW2d 883 (1968) (same). After all, if the Legislature can adopt an initiative proposal within 40 days of its presentment and then make whatever changes it wants on the 41*st* day, it would have no reason to "propose a different measure upon the same subject by a yea and nay vote upon separate roll calls . . . ." Const 1963, art 2, § 9. In that way, the argument that adopt-and-amend is constitutional functionally reads one of the Legislature's three express options out of Article 2, § 9.[11] See *Paquin*, 504 Mich at 133.

___

representative and direct democracy," *The Democracy Principle in State Constitutions*, 119 Mich L Rev at 923, and it recognizes that "democracy" itself is core to our Constitution and must inform the lens we use to interpret laws.

[11] For this reason, we are not persuaded by Chief Justice CLEMENT's argument that "[w]hile it is true that Article 2, § 9 requires the Legislature to enact or reject a law proposed by initiative petition 'without change or amendment' and that Article 2, § 9 requires the

Second, our canons dictate that this Court consider "the text's original meaning to the ratifiers, the people, at the time of ratification." *Wayne Co v Hathcock*, 471 Mich 445, 468; 684 NW2d 765 (2004), citing *People v Nutt*, 469 Mich 565, 573; 677 NW2d 1 (2004). To that end, it is implausible that the ratifiers understood their inclusion of three discrete options for the Legislature as allowing a *contradictory* fourth option. The "most obvious . . . understanding," *Citizens Protecting Michigan's Constitution*, 503 Mich at 61, of Article 2, § 9, given its three explicit options, is that no fourth contradictory option exists.[12] (Quotation marks and citation omitted.)

Third, to the extent that Article 2, § 9 is ambiguous, we must "liberally construe[]" the provision in favor of the people. *Kuhn*, 384 Mich at 385. Chief Justice CLEMENT contends that we need not liberally construe Article 2, § 9 in favor of the people because the plain text is unambiguous. Although we agree that the text is unambiguous, we find that it unambiguously provides three possible options, as discussed previously. To the

_____

proposed law to go on the ballot if the Legislature rejects it, Article 2, § 9 requires this only during the 40 session days after the Legislature receives an initiative petition[.]" That reading would render one of the three express options presented to the Legislature to be surplusage. See *Paquin*, 504 Mich at 133.

[12] To that end, we find that Justice ZAHRA's repeated references to the Legislature having "rejected" the original initiatives support our holding. If the Legislature wished to reject the initiatives, it had two constitutionally permissible ways of doing so—both of which required the matter to go to the voters.

Relatedly, Justice ZAHRA spends several pages explaining the difference between the original laws and the amendments and suggesting why the Legislature made those changes. In so doing, Justice ZAHRA ignores the fact that the Constitution already provides an option for when the Legislature wishes to propose an alternative to an initiative petition. In such cases, however, the original initiatives and the proposed alternatives must be placed on the ballot alongside one another.

14

extent that one finds that Article 2, § 9 is ambiguous due to its silence as to the permissibility of adopt-and-amend, a liberal construction in the people's favor surely cuts against that fourth option. Construing Article 2, § 9 in favor of the people requires that we not allow the Legislature to sidestep the people's reserved power. See *id*.; see also *The Democracy Principle in State Constitutions*, 119 Mich L Rev at 861.

Finally, as discussed earlier, we must examine "whether a particular law constitutes an 'undue burden' on voters' exercise of their direct-democracy rights." *League of Women Voters*, 508 Mich at 541. In this case, when the Legislature passed the Amended Wage Act and the Amended Earned Sick Time Act, it obstructed voters' ability to exercise their direct democracy rights through the initiative process. That is because the Legislature's actions in adopting the initiative petitions and then amending them in the same legislative session deprived the people of access to the process that is guaranteed to them under Article 2, § 9. Accordingly, we hold that the Legislature unduly burdened voters' direct democracy rights through the adopt-and-amend process. See *id*.[13]

---

[13] Chief Justice CLEMENT takes issue with our reliance upon *League of Women Voters* and the proposition that a law unduly burdening voters' direct democracy rights under Article 2, § 9 weighs against its constitutionality. *League of Women Voters* concerned the constitutionality of certain amendments of the Michigan Election Law, MCL 168.1 *et seq*. See *League of Women Voters*, 508 Mich at 529. We premised our analysis upon the principle that " '[t]he only limitation, unless otherwise expressly indicated, on legislation supplementary to self-executing constitutional provisions is that the right guaranteed shall not be curtailed or any undue burdens placed thereon.' " *League of Women Voters*, 508 Mich at 541, quoting *Hamilton v Secretary of State*, 227 Mich 111, 125; 198 NW 843 (1924) (opinion by BIRD, J.). We determined that our inquiry "*must* be concerned with whether a particular law constitutes an 'undue burden' on voters' exercise of their direct-democracy rights." *League of Women Voters*, 508 Mich at 541 (emphasis added). Thereafter, we repeatedly emphasized that we had to consider whether the amendments at issue imposed an undue burden on voters' direct democracy rights. *Id*. at 541-552. Although the amended laws at issue here do not concern guidelines that purportedly effectuate self-executing constitutional provisions, as was the case in *League of Women*

15

## 2. THE HISTORY AND SPIRIT OF ARTICLE 2, § 9

The history of the initiative power in Michigan informs our holding that adopt-and-amend is unconstitutional. See *Kearney v Bd of State Auditors*, 189 Mich 666, 671; 155 NW 510 (1915) (explaining that constitutional interpretation requires courts to consider the "object sought to be accomplished and the mischief to be guarded against" through a constitutional provision). Michigan voters reserved the initiative power to themselves to make government more responsive to the people. Until 1908, Michigan did not allow initiatives or referenda in any capacity. See *League of Women Voters*, 508 Mich at 538. In the early twentieth century, however, voters across the country grew tired of unresponsive and corrupt state legislatures. See, e.g., *id*.; *The Democracy Principle in State Constitutions*, 119 Mich L Rev at 884. To gain a more responsive government, Michigan voters demanded direct democracy powers. As we have previously explained:

> "The initiative found its birth in the fact that political parties repeatedly made promises to the electorate both in and out of their platforms to favor and pass certain legislation for which there was a popular demand. As soon as [the] election was over their promises were forgotten, and no effort was made to redeem them. These promises were made so often and then forgotten that the electorate at last through sheer desperation took matters into its own hands and constructed a constitutional procedure by which it could effect changes in the Constitution and bring about desired legislation without the aid of the legislature." [*League of Women Voters*, 508 Mich at 538, quoting *Hamilton v Secretary of State*, 227 Mich 111, 130; 198 NW 843 (1924) (opinion by BIRD, J.).]

---

*Voters*, the principle that laws may not place an undue burden on the rights such provisions guarantee nonetheless holds true. Accordingly, we hold that one reason why adopt-and-amend is unconstitutional is because it unduly burdens voters' direct democracy rights under Article 2, § 9. See *id*.

The initiative first appeared in Michigan in the 1908 Constitution, which provided for an initiative process by which the Legislature could place a bill on the ballot. See Const 1908, art 5, § 38. The 1908 Constitution did not allow for citizen petitions. See *id*. By 1913, however, the people determined that Legislature-sponsored initiatives were insufficiently responsive to the people. See *League of Women Voters*, 508 Mich at 538. Accordingly, the people amended the Constitution in 1913 to provide for citizen petitions. See *id*. By allowing for citizen petitions, the people "claw[ed] back from the Legislature the right of the people themselves to initiate legislation . . . ." *Id*. Then, during the 1963 Constitutional Convention, the framers further updated the initiative provisions to remove overly technical language. See *id*. at 539; see also Const 1963, art 2, § 9.

In sum, "Michigan voters added the constitutional provision allowing for initiative provisions in order to make our government more responsive to our people." See *League of Women Voters*, 508 Mich at 538-539; see also *The Democracy Principle in State Constitutions*, 119 Mich L Rev at 884. It appears that contemporaneous observers understood that adopt-and-amend is impermissible. Shortly after the people ratified the 1963 Constitution, for example, Attorney General Frank Kelley issued an opinion interpreting Article 2, § 9.[14] See 1 OAG, 1964, No. 4,303, p 309 (March 6, 1964). In that opinion, Attorney General Kelley wrote that "[i]t is . . . clear that the legislature enacting

---

[14] Opinions of the Attorney General are not binding on this Court. See *Danse Corp v Madison Hts*, 466 Mich 175, 182 n 6; 644 NW2d 721 (2002). This opinion does not purport to suggest that Attorney General Kelley's opinion was binding, but we find it helpful and persuasive in parsing the common understanding of the initiative power, particularly given that it was written in such close proximity to the adoption of Const 1963, art 2, § 9.

an initiative petition proposal cannot amend the law so enacted at the same legislative session without violation of the spirit and letter of" Article 2, § 9.[15] *Id*. at 311.

Chief Justice CLEMENT points to colloquies at the constitutional convention to suggest that the framers understood that adopt-and-amend was permissible. As a threshold matter, we caution that such "debates must be placed in perspective" because "[t]hey are individual expressions of concepts as the speakers perceive them (or make an effort to explain them)." *Regents of Univ of Mich v Michigan*, 395 Mich 52, 59-60; 235 NW2d 1 (1975). For that reason, although constitutional convention colloquies can be "illuminating," they are "not decisive as to the intent of the general convention (or of the people) in adopting the measures." *Id*. at 60.

With that qualifier, however, we find that the record of the constitutional convention supports our holding. Delegate Downs, for example, emphasized that the framers "wanted to guard against . . . a situation where the people go to all the effort of an initiative

---

[15] It is worth observing that lame duck sessions were once exceedingly rare. In the 100 years preceding the adoption of the 1963 Constitution, the Michigan Legislature met for a lame duck session fewer than 10 times. Thus, it appears that the Legislature adopting and then amending an initiative during a lame duck session would have been inconceivable to the Constitution's drafters and the ratifiers—especially considering the transformational nature of the Wage Act and the Earned Sick Leave Act. Moreover, adopting and amending during a lame duck session is an especially pronounced violation of the people's direct democracy rights because many of the lame duck legislators cannot be held accountable at the polls.

In her dissent, Chief Justice CLEMENT poses a hypothetical in which the Legislature adopts an initiative during an odd-year legislative session and then guts that initiative in January of the even-year legislative session. Although those facts are not before us, we observe that under such a hypothetical, the Legislature would be accountable to voters in the subsequent general election—just as if it had rejected the initiative. In this case, by contrast, the lame duck legislators avoided the democratic accountability that Article 2, § 9 was designed to provide.

18

campaign, which is hard work, win it, and then have the legislature by a 51 per cent [sic] vote reverse it." 2 Official Record, Constitutional Convention 1961, p 2396. Delegate Downs made that comment while discussing the protections afforded to voter-approved initiatives. His comments demonstrate that neither the framers nor the ratifiers could have envisioned the Legislature rejecting an initiative's key proposals while sidestepping the will of the people. For that reason, Delegate Downs explained that the Legislature has only three options upon receiving a valid initiative petition: "adopt it, do nothing, or provide an alternative . . . ." *Id.* at 2394. As discussed earlier in this opinion, a reading finding that adopt-and-amend is permissible would render the third option surplusage.

Similarly, Delegate Kuhn stated that the Legislature would adopt an initiative "in toto" only "if the legislature in their wisdom feel[s] it looks like [the proposed law] is going to be good . . . ." *Id.* at 2395. More dispositively, Delegate Kuhn shared Delegate Downs's understanding that the Legislature has only three options upon receiving a valid initiative petition:

> [B]ut what are the rights of the legislature after the people start this petition and have the 10 per cent [sic] of the people who voted for governor? They must accept it within 40 days, and accept it in toto, or they must place it on the ballot. [*Id.* at 2394].

Delegate Kuhn's statements demonstrate that adopting an initiative and then amending it in a manner that strips it of its key elements would have been unthinkable to the framers and to the ratifiers.

Considering this history, it is no surprise that until 2018, the Legislature had never attempted to adopt and amend an initiative. Indeed, by attempting to both reject an initiative and sidestep the people, adopt-and-amend impermissibly "thwart[s]" the power

19

that the people reserved for themselves. *Farm Bureau*, 379 Mich at 395. As we have held, the people's reserved power under Article 2, § 9 must "be saved if possible" from "evasion or parry by the legislature." *Id*. at 393.

### 3. CASELAW REGARDING ARTICLE 2, § 9

With respect to this Court's caselaw, *Farm Bureau* is instructive. *Farm Bureau* concerned a Michigan statute that exempted Michigan from a federally imposed daylight savings time scheme. *Farm Bureau*, 379 Mich at 392-393. A citizen referendum petition campaign opposed the exemption (preferring to follow federal daylight savings time) and gathered sufficient signatures and submitted the petition for consideration on the general ballot.[16] *Id*. at 392. A group of citizens sought to prevent the Legislature from adopting and then repealing the controversial law twice a year after it was given immediate effect, thereby preventing citizens from submitting referendum petitions on the law. *Id*. at 395. In essence, those citizens were worried that the Legislature could override the will of the voters through a process analogous to the one before us in this case: adopt-and-repeal.[17]

---

[16] Just as citizens can initiate laws under Article 2, § 9, so too can citizens gather signatures asking that a similar process be used to repeal a law. Const 1963, art 2, § 9. Both processes—the initiative and the referendum—exist so that citizens can have a direct voice in our laws. See *id*.

[17] We disagree with Chief Justice CLEMENT's description of *Farm Bureau*. Chief Justice CLEMENT contends that the issue in *Farm Bureau* was not whether the Legislature could adopt and repeal but instead "how to interpret the word 'within' in Article 2, § 9." Indeed, *Farm Bureau* did concern analyzing the section of § 9 stating that "[t]he power of referendum does not extend to acts making appropriations for state institutions or to meet deficiencies in state funds and must be invoked in the manner prescribed by law *within* 90 days following the final adjournment of the legislative session at which the law was enacted." Const 1963, art 2, § 9 (emphasis added). However, the Court conducted that inquiry to determine whether the Legislature could adopt and repeal a law preserving daylight savings time. See *Farm Bureau*, 379 Mich at 394-395 ("The construction claimed

20

The Court began its analysis by quoting Justice COOLEY:

"A Constitution is made for the people and by the people. The interpretation that should be given it is that which reasonable minds, the great mass of the people themselves, would give it. 'For as the Constitution does not derive its force from the convention which framed, but from the people who ratified it, the intent to be arrived at is that of the people, and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, but rather that they have accepted them in the sense most obvious to the common understanding, and ratified the instrument in the belief that that was the sense designed to be conveyed.' " [*Id*. at 391 (emphasis omitted), quoting *May v Topping*, 65 W Va 656, 660; 64 SE 848 (1909), in turn quoting Cooley, Constitutional Limitations (6th ed), p 81.]

The Court agreed with the concerned citizens and held that an adopt-and-repeal scheme would violate Article 2, § 9. *Farm Bureau*, 379 Mich at 395. The Court conceded that because the Constitution does not expressly prohibit adopt-and-repeal, the question was "not without difficulty." *Id*. at 393. Despite that difficulty, the Court observed the "overriding rule of constitutional construction which requires that the commonly understood referral process, forming as it does a specific power the people themselves have expressly reserved, be saved if possible as against conceivable if not likely evasion or parry by the legislature." *Id*. Accordingly, the Court held that adopt-and-repeal would

here by plaintiffs would permit outright legislative defeat, not just hindrance, of the people's reserved right to test, by referendary process, the exemption made by Act No. 6 or any like immediate-effect exemption the legislature might enact come the showers of April each year hereafter. To be specific: With such construction announced judicially, the legislature would stand free to avoid effective referral of this and future legislative exemptions under aforesaid 3(a) simply by repealing Act No. 6 next November, then by enacting another immediate-effect act of exemption next spring and then by another repealer in the late fall, and so on through the years. For that particular reason plaintiffs' proposed interpretation of the first two paragraphs of section 9 has been rejected and that proposed by defendants and by the attorney general has been accepted.").

21

impermissibly "thwart" the people's reserved power under Article 2, § 9 and was therefore unconstitutional. *Id*. at 395.

Although *Farm Bureau* discussed an adopt-and-repeal scheme, the identical analysis applies to an adopt-and-amend scheme. Both are designed to evade the citizen-led processes set forth in Article 2, § 9, and both are unconstitutional. See *id*. The State has failed to explain how the adopt-and-repeal legislative scheme discussed in *Farm Bureau* differs legally or practically from the adopt-and-amend scheme used here. Both schemes would allow the Legislature to usurp the people's reserved powers. Put simply, if adopt-and-repeal is unconstitutional, so too is adopt-and-amend. See *id*.

*Kuhn* also informs our decision. That case concerned the interplay between the Income Tax Act (the Act), MCL 206.1 *et seq*., and the provision in Article 2, § 9 stating that "[t]he power of referendum does not extend to acts making appropriations for state institutions or to meet deficiencies in state funds . . . ." See *Kuhn*, 384 Mich at 381-382. The Act provided that it was passed " 'for the purpose of meeting deficiencies in state funds' " and that it would not take effect " 'unless the estimated revenues to be collected therefrom are required to meet deficiencies in state funds . . . .' " *Id*. at 382-383 (citations omitted). However, the plaintiffs "alleged that there was no deficiency in state funds at the time the Act was enacted." *Id*. at 383. The plaintiffs contended, therefore, that the Legislature "inserted the language regarding meeting deficiencies in state funds into the Act in a devious attempt to avoid the people's constitutional power of referendum in view of the . . . restrictions on that power." *Id*. The constitutional stakes in *Kuhn* were high. At issue was whether the Legislature could prevent an act from being subject to referendum by simply referring to deficiencies in state funds in the statutory text. See *id*.

22

We resolved this apparent conflict by "determining whether the phrase 'deficiencies in state funds' in [Article 2, § 9] of the 1963 Constitution encompasses future deficiencies . . . or whether the language refers only to actual deficiencies in state funds existing at the time the statute in question was enacted." *Id*. at 384. Relying on the principle that "constitutional provisions by which the people reserve to themselves a direct legislative voice ought to be liberally construed," *id*. at 385, citing *Farm Bureau*, 379 Mich at 391, we held that " 'deficiencies in state funds' refers only to such deficiencies as exist at the time of passage of the Act in question," *Kuhn*, 384 Mich at 385.

The Court in *Kuhn* understood that our Constitution is silent as to whether the phrase "deficiencies in state funds" encompasses future deficiencies. We reasoned, however, that "[i]f the drafters of the constitution wanted the people to more severely restrict the reserved power of referendum, they should have plainly so advised them by inserting 'present or future,' or some such phrase, before 'deficiencies' in [Article 2, § 9]." *Id*. at 385-386. Accordingly, we held "that [the Act] was subject to referendum." *Id*. at 386. Any other interpretation would have "allow[ed] revenue statutes to avoid the possibility of referendum by reference to *anticipated* deficiencies, resulting from future, simultaneous or even previous appropriations." *Id*.

As in *Kuhn*, we are tasked with interpreting the Constitution's silence. And, as in *Kuhn*, we construe that silence liberally and in favor of the people's reserved power. See *id*. at 385. In other words, "[i]f the drafters of the constitution wanted" to provide the Legislature with a fourth option upon receiving a valid initiative petition, "they should have plainly so advised [the Legislature] by inserting" instructions for that option in Article 2, § 9. *Id*. at 385-386. Chief Justice CLEMENT attempts to differentiate this case from *Farm*

23

*Bureau* and *Kuhn* by contending that our interpretation of Article 2, § 9 in this case "would not prevent the people from initiating or referring laws in the same way the rejected interpretations in *Mich Farm Bureau* and *Kuhn* would have." We disagree. *Farm Bureau*, *Kuhn*, and the instant matter all concerned possible schemes through which the Legislature could effectively negate the people's reserved direct democracy powers. *Farm Bureau*, 379 Mich at 394; *Kuhn*, 384 Mich at 386. Chief Justice CLEMENT attempts to get around this fact by arguing that adopt-and-repeal is substantively different from adopt-and-amend. We find no meaningful difference between the two schemes. Both would prevent citizens from utilizing the citizen-led procedures set forth in Article 2, § 9 until a Legislature stopped adopting and amending or adopting and repealing. Both adopt-and-repeal and adopt-and-amend prevent voters from exercising their constitutionally guaranteed direct democracy powers, and both schemes are unconstitutional.

Finally, Chief Justice CLEMENT states that "our decisions in *Mich Farm Bureau* and *Kuhn* stand for the unremarkable proposition that when the text of Article 2, § 9 is unclear, we will interpret it to inhibit the Legislature from preventing the people from exercising their right to refer laws and—by extension—to initiate laws." We agree. Unlike Chief Justice CLEMENT, however, we find that through its provision of three discrete options, the plain text unambiguously prohibits adopt-and-amend. To the extent that the text is ambiguous, however, a liberal construction favors our holding. Chief Justice CLEMENT has not presented any argument to the contrary. For that reason, *Farm Bureau* and *Kuhn* support our holding.

24

## 4. THE LEGISLATURE'S POWERS DO NOT OVERRIDE THE PEOPLE'S INITIATIVE POWERS

The State and the Court of Appeals contend that Article 4 of the 1963 Michigan Constitution provides the Legislature with the power to adopt and amend. Article 4 provides that "the legislative power of the State of Michigan is vested in a senate and a house of representatives." Const 1963, art 4, § 1. The State asserts that this grant is plenary and that the Legislature "can do anything which it is not prohibited from doing by the people through the Constitution . . . ." *Mich Coalition of State Employee Unions v Michigan*, 498 Mich 312, 331-332; 870 NW2d 275 (2015) (quotation marks and citation omitted). Accordingly, the State argues, because the Constitution does not prohibit adopt-and-amend expressly, the Legislature is free to employ that tactic.

That argument lacks merit. To start, it conflicts with *Farm Bureau*. The Constitution does not expressly prohibit adopt-and-repeal. Nevertheless, despite the Legislature's Article 4 powers, we held that the Legislature may not employ an adopt-and-repeal scheme. *Farm Bureau*, 379 Mich at 395.

Moreover, as discussed earlier, the people reserved the power of the initiative to themselves. Accordingly, to the extent that the Legislature's lawmaking power is plenary under Article 4, that power does not apply to the initiative, which is a right reserved to the people. See Const 1963, art 2, § 9; *Kuhn*, 384 Mich at 385. By reserving the initiative power to the people, the Constitution limits the Legislature's role with respect to initiatives to the powers expressly conferred upon it. See Const 1963, art 2, § 9; *Kuhn*, 384 Mich at 385. Here, the drafters of the Constitution provided three specific pathways for the Legislature when presented with an initiative. Certainly, the drafters did not need to outline

25

what was not permitted when they clearly set forth the permitted pathways. See *Detroit v Redford Twp*, 253 Mich 453, 455-456; 235 NW 217 (1931) (explaining that under the negative implication canon, express mention of one thing "implies the exclusion of other similar things").

Relatedly, the State contends that *Frey v Dep't of Social Servs Dir*, 162 Mich App 586; 413 NW2d 54 (1987), is dispositive in showing that the Legislature's Article 4 powers apply to the people's Article 2 initiative powers. *Frey* concerned whether a voter-sponsored initiative regarding the use of public funds for abortions, which the Legislature adopted, took immediate effect or was instead governed by Article 4, § 27. Article 4, § 27 provides, in pertinent part, that "[n]o act shall take effect until the expiration of 90 days from the end of the session at which it was passed . . . ." Article 2, § 9 states that any law approved by the voters "shall take effect 10 days after the date of the official declaration of the vote." But the same section is silent on the effective date for initiatives that the Legislature adopts. This Court stated expressly that our holding was limited solely to the narrow issue of when a law takes effect: "[w]e *only hold* that when an initiated law is enacted by the Legislature, it is subject to art 4, § 27." *Frey v Dep't of Mgt & Budget*, 429 Mich 315, 338; 414 NW2d 873 (1987) (emphasis added). In other words, we simply clarified that when the Legislature adopts an initiative petition into law, then the normal effective date applied to any law passed by the Legislature applies. Contrary to the State's assertion, *Frey* did not hold that the Legislature's powers set forth in Article 4, § 27 can override the people's initiative powers set forth in Article 2, § 9. Such an interpretation would render the people's express reservation of the initiative power meaningless. See Const 1963, art 2, § 9.

26

Meanwhile, Chief Justice CLEMENT contends that one argument in support of the constitutionality of adopt-and-amend is that the people maintain "the right to bring a referendum petition against the Legislature's amendment." However, nothing in the plain text of Article 2, § 9 suggests that the referendum and initiative would have such a relationship. Nor is there any evidence in the historical record that the framers or the ratifiers intended the referendum to be a check against the Legislature's usurpation of the people's reserved initiative power. In other words, the people did not create additional hoops through which to jump to assert their rights to direct democracy. It is difficult to fathom that the framers intended for voters to expend countless resources and time to gather thousands of signatures to place an initiative on the ballot only to have to do so all over again via a referendum after the Legislature adopts and then amends the initiative.

Finally, amici arguing in favor of adopt-and-amend assert that holding that adopt-and-amend is unconstitutional necessarily means that initiatives adopted by the Legislature can *never* be amended absent a $^3/_4$ vote of the Legislature. That slippery slope argument is unpersuasive. Recall that under Article 2, § 9, initiatives that the people approve at the polls can only be amended by a $^3/_4$ legislative vote. Thus, voter-approved initiatives receive quasi-constitutional protection given that a super majority is needed to make changes to such laws. As contemporary observers understood, voter-approved initiatives differ from Legislature-approved initiatives.

Attorney General Kelley explained shortly after the 1963 Constitution was ratified that "initiative petition[s] enacted into law by the legislature . . . are subject to amendment by the legislature at a *subsequent* legislative session." 1 OAG, 1964, No. 4,303, at 311 (emphasis added). However, the Attorney General added, "[i]t is equally clear that the

27

legislature enacting an initiative petition proposal cannot amend the law so enacted at the *same* legislative session without violation of the spirit and letter of" Article 2, § 9. *Id.* (emphasis added).

The reason for Attorney General Kelley's conclusion is plain: unlike voter-approved initiative petitions, Legislature-approved initiative petitions have not been approved by the voters. Instead, Legislature-approved initiative petitions need only be approved by 8% of the electorate and a majority of the Legislature. Const 1963, art 2, § 9. For that reason, Legislature-approved initiative petitions do not receive the same quasi-constitutional protection as voter-approved petitions. See *The Democracy Principle in State Constitutions*, 119 Mich L Rev at 861 (explaining that state constitutions such as Michigan's "privilege 'rule by the people,' and especially rule by popular majorities"); *Kuhn*, 384 Mich at 385. At the same time, however, allowing the Legislature to bypass the voters and repeal the very same law it just passed in the same legislative session thwarts the voters' ability to participate in the lawmaking process.[18]

---

[18] In 2018, then Attorney General Bill Schuette issued an opinion concluding that adopt-and-amend was constitutionally permissible. See OAG, 2017-2018, No. 7,306 (December 3, 2018). In that opinion, Attorney General Schuette made arguments similar to those that the State makes—and that we reject—in the instant case. Attorney General Kelley's opinion has the benefit of providing us with insight into what the framers intended, given that it was authored in such close proximity to the time in which Const 1963, art 2, § 9 was ratified. Opinions of the Attorney General do not have binding force of law over our Court, but they may carry persuasive value. To the extent we are persuaded by either opinion, we consider Attorney General Kelley to be more persuasive.

This is not to say, of course, that contemporaneous analysis is always more persuasive than analysis provided with the benefit of distance or hindsight. In this case, however, we find that distance and hindsight did not provide Attorney General Schuette with a better argument than the one Attorney General Kelley made in 1964.

In sum, by adopting the Wage Act and the Earned Sick Time Act and then later stripping those acts of their key features in the same legislative session, the Legislature unconstitutionally violated the people's initiative rights. Accordingly, we hold that the Amended Wage Act and the Amended Earned Sick Time Act are unconstitutional.

## B. REMEDY

Having established that the Amended Wage Act and the Amended Earned Sick Time Act are unconstitutional, our next task is to determine what law must be in place given that the 2018 Legislature adopted the original Wage Act and Earned Sick Time Act prior to amending both laws.

This Court applies the "general rule of statutory interpretation that an unconstitutional statute is void *ab initio*." *Stanton v Lloyd Hammond Produce Farms*, 400 Mich 135, 144; 253 NW2d 114 (1977). " 'However, where injustice might result from full retroactivity, this Court has adopted a more flexible approach, giving holdings limited retroactive or prospective effect.' " *League of Women Voters*, 508 Mich at 565, quoting *Lindsey v Harper Hosp*, 455 Mich 56, 68; 564 NW2d 861 (1997). Thus, "[i]f a decision establishes a 'new principle of law,' [this Court] then consider[s] three factors: '(1) the purpose to be served by the new rule, (2) the extent of the reliance on the old rule, and (3) the effect of retroactivity on the administration of justice.' " *League of Women Voters*, 508 Mich at 565-566, quoting *Pohutski v Allen Park*, 465 Mich 675, 696; 641 NW2d 219 (2002).

Relatedly, courts possess broad equitable powers to right statutory and constitutional wrongs. Those powers are defined by pragmatic flexibility. See, e.g., *Hecht*

29

*Co v Bowles*, 321 US 321, 329-330; 64 S Ct 587; 88 L Ed 754 (1944) ("The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims."); *Brown v Bd of Ed of Topeka*, 349 US 294, 300; 75 S Ct 753; 99 L Ed 1083 (1955) ("In fashioning and effectuating the decrees, the courts will be guided by equitable principles. Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs.") (citations omitted).

With those principles in mind, this Court must fashion equitable relief that remedies the Legislature's constitutional mischief while remaining mindful of employers' reasonable reliance on the Legislature's unconstitutional acts. See *League of Women Voters*, 508 Mich at 565-566. Such relief must necessarily be shaped "by a practical flexibility" that reconciles employers' reasonable needs and expectations with the people's rights to the initiative. See *Brown*, 349 US at 300.

In that spirit, our first holding regarding the appropriate remedy is a relatively easy one. The Legislature adopted the Wage Act and the Earned Sick Time Act. The amendments were unconstitutional and, therefore, void. See *Stanton*, 400 Mich at 144 (explaining that an unconstitutional statute is generally "void *ab initio*"). Thus, the original initiatives, as adopted by the Legislature, remain in place.[19] See *id*.

---

[19] Justice ZAHRA contends that we must focus our remedy on legislative intent. We find that argument unpersuasive in this case for two reasons. First, as discussed earlier, Article 2, § 9 concerns the people's reserved power, not the Legislature's. Second, in this case,

30

Second, these initiatives provided stakeholders with 205 days between the laws' enactment and their effective dates.[20] That transition time presumably existed to provide employers with time to prepare to comply with these new laws, which dramatically alter pay and time-off policies. Given that this is the time period that would have been required had the Legislature abided by the Constitution, we hold that, except as discussed later in this opinion, the Wage Act and the Earned Sick Time Act go back into effect 205 days after this opinion's publication date.

Our third holding is similarly straightforward and rooted in equitable principles. See *League of Women Voters*, 508 Mich at 565-566. The Legislature, not employers, was responsible for the constitutional mischief known as adopt-and-amend. Accordingly, we hold that employers cannot be held liable for their reasonable reliance upon the state government's assurances that the Amended Wage Act and the Amended Earned Sick Time Act were good law. Indeed, "injustice might result" if courts punished employers for following the law as provided on the state's official websites. *League of Women Voters*, 508 Mich at 565 (quotation marks and citation omitted).

Next, we must determine how to apply the Wage Act provisions that were set to phase in over time: the general minimum hourly wage and the minimum wage for tipped employees. With respect to the general minimum hourly wage, as discussed earlier, the Wage Act—prior to being amended by the Legislature—envisioned phasing in an

---

the Legislature's intent was to commit an unconstitutional act. In such a case, we must prioritize our Constitution over legislative intent.

[20] The Legislature approved the laws on September 5, 2018. Both laws were set to go into effect on March 29, 2019.

increased minimum wage over four years. 2018 PA 337, § 4(1). The law would have set the minimum wage at $10.00 per hour in 2019 and would have mandated that the minimum wage be increased to the following levels each year thereafter: $10.65 in 2020, $11.35 in 2021, and $12.00 in 2022. *Id.* In late 2022, the state treasurer was to commence adjusting the minimum hourly wage every year based upon the inflation rate. 2018 PA 337, § 4(2). The Wage Act similarly planned a gradual phase-in for the changes to the minimum wage for tipped employees:

> [T]he minimum hourly wage rate of an employee shall be 48% of the minimum hourly wage rate established . . . effective January 1, 2019; beginning January 1, 2020, it shall be 60% of the minimum hourly wage rate established under section 4; beginning January 1, 2021, it shall be 70% of the minimum hourly wage rate established under section 4; beginning January 1, 2022, it shall be 80% of the minimum hourly wage rate established under section 4; beginning January 1, 2023, it shall be 90% of the minimum hourly wage rate established under section 4; and beginning January 1, 2024 and thereafter, it shall be 100% of the minimum hourly wage rate established under section 4. [2018 PA 337, § 4d(2).]

Because the original, unamended Wage Act established a gradual phase-in of the minimum wage increases, an appropriate remedy here would also incorporate gradual increases on a similar time line. However, as noted, the original Wage Act tied these gradual increases to dates that have since passed. To fashion an appropriate remedy that reflects the original initiative's purpose, we hold that a gradual phase-in mirroring the structure of the original Wage Act is most consistent with the Wage Act's intent. Accordingly, we adopt a remedy that links wage increases to the same annual schedule as originally proposed, but set into the future, starting on the effective date of this opinion. The minimum wage increases shall therefore go into effect 205 days after this opinion's publication as if that day were January 1, 2019.

32

Finally, we must determine how to account for inflation. As discussed earlier, the Wage Act directed the state treasurer to begin adjusting the minimum wage to account for inflation in October 2022. 2018 PA 337, § 4(2). We see no reason for delay. We are cognizant, after all, that nearly six years have passed since the Legislature adopted the Wage Act and that the $10.00 starting point that the Wage Act envisioned for 2019 is not the same as $10.00 in 2024.[21] In keeping with the statute's plan to begin accounting for inflation by 2022, we hold that the state treasurer must use this opinion's publication date to calculate the inflation-adjusted rates for the minimum hourly wage prescriptions provided in the Wage Act.[22] Thereafter, in accordance with the Wage Act's original design, the state treasurer shall calculate the inflation-adjusted minimum wage as described in 2018 PA 337, § 4(2). Because the minimum wage increases will go into effect in 2025, we will treat the years 2019 to 2022 as the years 2025 to 2028 (plus the necessary inflation adjustment) to reflect the statute's graduated implementation. The inflation-adjusted minimum wage will commence correspondingly in 2029 (originally 2023) as set forth in 2018 PA 337, § 4(2).[23]

---

[21] See, e.g., Bureau of Labor Statistics, *CPI Inflation Calculator* <https://data.bls.gov/cgi-bin/cpicalc.pl> (accessed June 13, 2024).

[22] In so doing, the state treasurer shall follow the procedures set forth in 2018 PA 337, § 4(2). In other words, the state treasurer shall publish those amounts "by November 1 of the year it is calculated and shall be effective beginning" 205 days after this opinion's publication. 2018 PA 337, § 4(2).

[23] The publication date for this opinion is July 31, 2024. Thus, the Wage Act and the Earned Sick Time Act will go into effect on February 21, 2025. The schedule for the minimum hourly wage and tip credit is therefore as follows:

February 21, 2025 (originally 2019): The minimum hourly wage will be $10.00 plus the state treasurer's inflation adjustment, using July 31, 2024, as the endpoint for that calculation. The tip credit will be 48% of minimum wage.

We reiterate that the Legislature acted unconstitutionally when it enacted the Amended Wage Act and the Amended Earned Sick Time Act. It did not, however, act unconstitutionally when it adopted the original initiative petitions without change.[24] Accordingly, our remedy revives the constitutional status quo while accounting for the passage of time.[25]

---

February 21, 2026 (originally 2020): The minimum hourly wage will be $10.65 plus the state treasurer's inflation adjustment, using July 31, 2024, as the endpoint for that calculation. The tip credit will be 60% of minimum wage.

February 21, 2027 (originally 2021): The minimum hourly wage will be $11.35 plus the state treasurer's inflation adjustment, using July 31, 2024, as the endpoint for that calculation. The tip credit will be 70% of minimum wage.

February 21, 2028 (originally 2022): The minimum hourly wage will be $12.00 plus the state treasurer's inflation adjustment, using July 31, 2024, as the endpoint for that calculation. The tip credit will be 80% of minimum wage.

February 21, 2029 (originally 2023 and after): The state treasurer shall calculate the inflation-adjusted minimum wage as set forth in 2018 PA 337, § 4(2). The tip credit will no longer exist.

[24] To be clear, because the Legislature's act of adopting the original initiative petitions was expressly allowed under the Constitution, our remedy does not discard this constitutional act as suggested in Justice ZAHRA's dissent. We seek only to remedy the unconstitutional act of adopting and amending within the same legislative session.

[25] Justice ZAHRA argues that by altering dates and adjusting dollar amounts to inflation—something courts routinely do when shaping remedies—we are exceeding our judicial power. He instead suggests that we "should . . . plac[e] the proposed initiative up for consideration by the voters of Michigan." Needless to say, we find that using our equitable powers to adjust dates and dollar amounts to account for the passage of time is a more modest use of judicial power than ordering a new election via judicial fiat. We observe, however, that the Legislature's decision to adopt and amend was an unprecedented and unconstitutional act. Fashioning an appropriate remedy in response to an unprecedented and unconstitutional legislative act is not necessarily easy. Nevertheless, resolving disputes by fashioning appropriate remedies is what courts are tasked with doing—even in difficult cases.

In keeping with this opinion, the Legislature—sitting in a session subsequent to the session at which the Legislature adopted the initiatives—may, of course, amend the laws as it sees fit.

## IV. CONCLUSION

For the reasons set forth in this opinion, we hold that Article 2, § 9 provides the Legislature with three—and only three—options upon receiving a valid initiative petition. Any legislative response to a valid initiative petition that falls outside those three discrete options is unconstitutional and impermissibly infringes upon the people's reserved power. Accordingly, we reverse the Court of Appeals' judgment and hold that 2018 PA 368 and 2018 PA 369 are unconstitutional. Moreover, except as discussed earlier in this opinion, we hold that the Wage Act and the Earned Sick Leave Act shall go into effect 205 days after this opinion's publication date.

Elizabeth M. Welch
Richard H. Bernstein
Megan K. Cavanagh
Kyra H. Bolden

STATE OF MICHIGAN

SUPREME COURT

MOTHERING JUSTICE, MICHIGAN ONE
FAIR WAGE, MICHIGAN TIME TO
CARE, RESTAURANT OPPORTUNITIES
CENTER OF MICHIGAN, JAMES HAWK,
and TIA MARIE SANDERS,

   Plaintiffs-Appellants/
   Cross-Appellees,

v               No. 165325

ATTORNEY GENERAL,

   Defendant-Appellee/
   Cross-Appellant,

and

STATE OF MICHIGAN,

   Defendant-Appellee.

_____

BOLDEN, J. (*concurring*).

I join the majority opinion in full to hold that 2018 PA 368 and 2018 PA 369 are unconstitutional because they amended ballot initiatives that had been adopted into law within the same legislative session, an act that was not included in the three options provided to the Legislature under the initiative clause of the Michigan Constitution. See Const 1963, art 2, § 9. Half of a decade later, we must now decide how to remedy the Legislature's choice of a pathway that avoided both enacting the petition's proposed measure as originally drafted and placing the issue on the ballot. It seems to me that the

best solution would be putting the issue on the ballot.  I write separately to share my disappointment that although petitioners followed the initiative clause of the Constitution to a tee, the issue somehow evaded the fundamental constitutional guarantee of placement on a ballot.

This case comes down to our interpretation of the Constitution's initiative clause, which states, in parts pertinent to our interpretation:

> The people reserve to themselves the power to propose laws and to enact and reject laws, called the initiative, and the power to approve or reject laws enacted by the legislature, called the referendum.  The power of initiative extends only to laws which the legislature may enact under this constitution. . . .

> \* \* \*

> Any law proposed by initiative petition shall be either enacted or rejected by the legislature without change or amendment within 40 session days from the time such petition is received by the legislature.  If any law proposed by such petition shall be enacted by the legislature it shall be subject to referendum, as hereinafter provided.

> If the law so proposed is not enacted by the legislature within the 40 days, the state officer authorized by law shall submit such proposed law to the people for approval or rejection at the next general election.  The legislature may reject any measure so proposed by initiative petition and propose a different measure upon the same subject by a yea and nay vote upon separate roll calls, and in such event both measures shall be submitted by such state officer to the electors for approval or rejection at the next general election.

> Any law submitted to the people by either initiative or referendum petition and approved by a majority of the votes cast thereon at any election shall take effect 10 days after the date of the official declaration of the vote.  No law initiated or adopted by the people shall be subject to the veto power of the governor, and no law adopted by the people at the polls under the initiative provisions of this section shall be amended or repealed, except by a vote of the electors unless otherwise provided in the initiative measure or by three-fourths of the members elected to and serving in each house of the legislature. [Const 1963, art 2, § 9.]

2

I agree with the majority that the plain text of the Constitution distinctly specifies that the Legislature has three options. Adopting the initiative is one avenue; however, adopting it and amending it within the same legislative session is not one of those options. Plainly, the Legislature was without constitutional authority to take such actions.

An initiative petition is one of three forms of direct democracy recognized by our Constitution. See *League of Women Voters of Mich v Secretary of State*, 508 Mich 520, 529-530; 975 NW2d 840 (2022). The initiative petition "allows 'voters [to] petition to propose statutes . . . to be adopted or rejected by the voters at the polls.' " *Ariz State Legislature v Ariz Indep Redistricting Comm*, 576 US 787, 794; 135 S Ct 2652; 192 L Ed 2d 704 (2015), quoting Magleby, Direct Legislation 1 (1984) (alteration by the *Ariz State Legislature* Court). The key to the initiative petition, then, it seems, would be following through with a process that would allow interested citizens to partake in the lawmaking process by opening up the citizens' legislative ideas to the public to vote on. In Michigan, it's a bit more complicated than this, because once a petition has been approved for the ballot, the Legislature is given the opportunity to either (1) enact the proposal as legislation; (2) choose not to enact the proposal but allow the public to vote on the initiative during the next general election; or (3) choose not to enact the proposal but put some modified version of the proposal up for the public to vote on during the next general election. In its simplest sense, if the Legislature does not like an initiative petition that has collected sufficient signatures and been approved for the general ballot, the measure is not guaranteed to become codified in statute, but it *is* guaranteed a public vote—even if in a modified version.

The legislative action of adopting the proposal and amending it without a public vote is contrary to Const 1963, art 2, § 9. The majority therefore gets it correct. However,

3

the Legislature's work-around of these constitutional provisions—that is, the adopt-and-amend procedure—skipped what is, to me, the most important part: the constitutional guarantee that the measure, in some form, would appear on the ballot for a public vote if the Legislature did not enact it into law.

After all, that was the alternative that was given if the Legislature chose to reject the initiative's proposed legislation. See Const 1963, art 2, § 9. However, at this point, this solution, too, would seem to defy the language of the Constitution itself and thus would be inadequate. The Constitution specifies, "No law as to which the power of referendum properly has been invoked shall be effective thereafter unless approved by a majority of the electors voting thereon at the *next* general election." *Id*. (emphasis added). Further, if the Legislature chose not to enact a proposed initiative, both options available to the Legislature involved placing the issue on the ballot for majority approval at the "*next* general election." *Id*. (emphasis added). The *next* general election would not have been the upcoming election but rather the election that took place in 2018. The initiative petition to which we now give our consideration, without dispute, met all statutory criteria to be on the 2018 ballot, including approval by the Board of State Canvassers. However, this initiative petition has not met any of the statutory criteria or received any of the necessary approvals to be on the ballot for the upcoming general election. The Constitution does not appear to authorize us to remedy the situation in this case through the means seemingly intended—by placing it on the ballot.

Thus, the majority properly reads Const 1963, art 2, § 9 to conclude that the Constitution gave the Legislature the choice between enacting the 2018 initiative petition's proposed measures into statute or rejecting the initiative petition and placing it, in some

4

form, on the 2018 ballot. The Legislature did not like the proposed measures—as evidenced by the Legislature's adopting and then amending the measures. Accordingly, the Legislature's only choices involved placing the measure—in some form—on the 2018 ballot for a majority vote. The majority properly understands that this means that 2018 PA 368 and 2018 PA 369 are unconstitutional because they avoided the constitutional guarantee of placement on the next general election's ballot. Further, the majority properly understands that because these public acts are unconstitutional, the Legislature's decision to enact the initiative petition's proposed measures into statute must be invoked, and the majority carefully designs a remedy that does so with fairness to all the concerns before our Court. Therefore, I join the majority opinion in full. However, I express my disappointment that no remedy exists through which we could provide the voters with the constitutional guarantees of the initiative clause by placing this matter on the ballot for a general election.

Kyra H. Bolden

5

STATE OF MICHIGAN

SUPREME COURT

MOTHERING JUSTICE, MICHIGAN ONE
FAIR WAGE, MICHIGAN TIME TO
CARE, RESTAURANT OPPORTUNITIES
CENTER OF MICHIGAN, JAMES HAWK,
and TIA MARIE SANDERS,

    Plaintiffs-Appellants/
    Cross-Appellees,

v                No. 165325

ATTORNEY GENERAL,

    Defendant-Appellee/
    Cross-Appellant,

and

STATE OF MICHIGAN,

    Defendant-Appellee.

_____

CLEMENT, C.J. (*dissenting*).

Article 4, § 1 of our Constitution vests the legislative power in the Legislature, which includes the power to amend existing laws. And it has always been understood that the Legislature's power under Article 4, § 1 is limited only if the Constitution expressly says so. Article 2, § 9 is silent about whether the Legislature may amend a law proposed by initiative petition that the Legislature has enacted, yet the majority concludes that the Constitution restricts the Legislature from amending a law proposed by initiative petition in the same legislative session (but, curiously, not later sessions). There is certainly reason to be frustrated by the Legislature's actions here: enacting laws proposed by initiative

petition to avoid ballot approval only to substantially alter them in the same legislative session. But nothing in Article 2, § 9 restricts the Legislature from doing so. And as tempting as it might be to step into the breach, this Court lacks the power to create restrictions out of whole cloth. That power remains with the people, as our Constitution dictates. I therefore dissent. I would have affirmed the judgment of the Court of Appeals.

## I. THE CONSTITUTIONAL TEXT

As the majority notes, when construing the Michigan Constitution, our goal "is to give effect to the intent of the people of the state of Michigan who ratified the Constitution, by applying the rule of common understanding." *Mich Coalition of State Employee Unions v Michigan*, 498 Mich 312, 323; 870 NW2d 275 (2015) (quotation marks and citation omitted). "We locate the common understanding of constitutional text by determining the plain meaning of the text as it was understood at the time of ratification." *Id*. When the plain meaning of the text is clear, our job is easy: we presume the people intended what they plainly expressed. See *Nat'l Pride at Work, Inc v Governor*, 481 Mich 56, 80; 748 NW2d 524 (2008); *American Axle & Mfg, Inc v Hamtramck*, 461 Mich 352, 362; 604 NW2d 330 (2000). It goes without saying that we have no power to add terms to the Constitution that are not there or that cannot be fairly implied by the existing terms. The people have reserved to themselves the power to amend the Constitution, see Const 1963, art 12, and they have delegated to us only the power to interpret the constitutional text they have ratified, see Const 1963, art 6, § 1.

As the majority also notes, in Const 1963, art 2, § 9, "[t]he people reserve[d] to themselves the power to propose laws and to enact and reject laws, called the initiative,

2

and the power to approve or reject laws enacted by the legislature, called the referendum." Article 2, § 9 allows the people to initiate a law by submitting a petition signed by a number of voters totaling at least 8% of the votes cast in the most recent general gubernatorial election. *Id.* Upon receiving a certified initiative petition, the Legislature must enact or reject the proposed law "without change or amendment" within 40 session days. *Id.* If the Legislature rejects the proposed law, Article 2, § 9 says the Legislature may propose a different law on the same subject. *Id.* If the Legislature does not enact the proposed law within the 40 session days, the proposed law—and the Legislature's alternative if it has proposed one—must be submitted to the people for approval or rejection at the next general election. *Id.*

Article 2, § 9 explicitly restricts the power of the Legislature and the Governor with respect to initiated laws and referred laws in several ways. First, if the Legislature enacts a law proposed in an initiative petition or the people approve the law at the polls, Article 2, § 9 restricts the Governor from vetoing the law. Second, if a law proposed in an initiative petition is approved by the voters, under Article 2, § 9, the Legislature may amend it only by vote of $^3/_4$ of the members elected to and serving in each house. Third, if a referred law is approved by the voters, under Article 2, § 9, the Legislature may amend it only in a later legislative session. Article 2, § 9 does not, however, restrict the Legislature from amending a proposed initiated law it has enacted. Unlike for voter-approved initiated laws and voter-approved referred laws, Article 2, § 9 is silent about whether the Legislature may or may not amend those laws enacted by the Legislature.

Despite this silence, the majority says that the text of Article 2, § 9 is clear: the Legislature cannot amend a law proposed in an initiative petition in the same legislative

3

session. The majority says this is because Article 2, § 9 gives the Legislature only three options when it receives a law proposed by an initiative petition: the Legislature must (1) enact the proposed law without change or amendment; (2) reject the proposed law without change or amendment; or (3) reject the proposed law and propose an alternative law on the same subject. And Article 2, § 9 says that if the Legislature does not enact the proposed law without change or amendment, then it must be submitted to the people for approval or rejection at the next general election. "Thus, the plain text of Article 2, § 9 makes clear that the Legislature cannot reject or alter an initiative without the voters' approval" according to the majority. *Ante* at 13 (opinion of the Court).

The majority's reasoning does not hold water. While it is true that Article 2, § 9 requires the Legislature to enact or reject a law proposed by initiative petition "without change or amendment" and that Article 2, § 9 requires the proposed law to go on the ballot if the Legislature rejects it, Article 2, § 9 requires this only during the 40 session days after the Legislature receives an initiative petition:

> Any law proposed by initiative petition shall be either enacted or rejected by the legislature *without change or amendment within 40 session days* from the time such petition is received by the legislature. If any law proposed by such petition shall be enacted by the legislature it shall be subject to referendum, as hereinafter provided.

> If the law so proposed is not enacted by the legislature within the 40 days, the state officer authorized by law shall submit such proposed law to the people for approval or rejection at the next general election. The legislature may reject any measure so proposed by initiative petition and propose a different measure upon the same subject by a yea and nay vote upon separate roll calls, and in such event both measures shall be submitted by such state officer to the electors for approval or rejection at the next general election. [Const 1963, art 2, § 9 (emphasis added).]

Again, Article 2, § 9 is silent about whether the Legislature may change or amend a law proposed by initiative petition once the Legislature has enacted it within those 40 session days.

This silence in Article 2, § 9 matters because in Article 4, § 1 of the Constitution, the people vested the legislative power in the Legislature. Const 1963, art 4, § 1 ("Except to the extent limited or abrogated by article IV, section 6 or article V, section 2, the legislative power of the State of Michigan is vested in a senate and a house of representatives."); see also *Taxpayers of Mich Against Casinos v Michigan*, 471 Mich 306, 328; 685 NW2d 221 (2004), quoting *Young v Ann Arbor*, 267 Mich 241, 243; 255 NW 579 (1934). The term "legislative power" has always been understood to include the power to make, alter, amend, and repeal laws. See *Harsha v Detroit*, 261 Mich 586, 590; 246 NW 849 (1933), citing 1 Cooley, Constitutional Limitations (8th ed), p 183.[1] And no one disputes that a law proposed in an initiative petition enacted by the Legislature is a law just

---

[1] As this Court has observed, when a phrase has a settled meaning and is afterwards incorporated into a new or revised Constitution, we presume the Framers and the people were aware of this meaning. See *Bds of Co Rd Comm'rs v Bd of State Canvassers*, 391 Mich 666, 675-676; 218 NW2d 144 (1974); *People ex rel Hughes v May*, 3 Mich 598, 610 (1855) ("Now the framers of a constitution are presumed to have a knowledge of existing laws, and of their construction and the mode of their administration, and to act in reference to that knowledge as much as legislators are, and in this light we construe both constitutional and statutory law."); *Advisory Opinion re Constitutionality of 1973 PA 1 & 2*, 390 Mich 166, 176-177; 211 NW2d 28 (1973) ("Thus, the concept of 'special obligation' bonds payable out of taxes levied for the privilege of use came to be recognized as another exception to the constitutional limitation on the incurment of state indebtedness and, whatever the logic of it, we are committed to its acceptance, since the people, presumably aware of the exception, did not eliminate it in the 1963 Constitution.").

5

like any other that has gone through the usual enactment and presentment process.[2]  Like a bill that has gone through the usual enactment and presentment process, a proposed initiated law enacted by the Legislature is subject to referendum, see Const 1963, art 2, § 9 ("If any law proposed by such petition shall be enacted by the legislature it shall be subject to referendum, as hereinafter provided."), it takes effect at the end of 90 days from the end of the legislative session at which it was passed unless ²/₃ of the members vote to give it immediate effect, see *Frey v Dep't of Mgt & Budget*, 429 Mich 315, 328; 414 NW2d 873 (1987) (holding that Const 1963, art 4, § 27 applies to initiated laws enacted by the Legislature), and it is subject to the title-object clause appearing in Const 1963, art 4, § 24, see *Leininger v Secretary of State*, 316 Mich 644, 648-649; 26 NW2d 348 (1947) (holding that the title requirement of Const 1908, art 5, § 21 applies to laws enacted by the initiative as well as to those enacted by the Legislature), superseded by constitutional amendment as stated in *Kuhn v Dep't of Treasury*, 384 Mich 378 (1971).  Accordingly, just as the Legislature may alter, amend, and repeal laws that were enacted through the usual enactment and presentment process, it may do the same to initiated laws it has enacted in the absence of any constitutional provision explicitly prohibiting such action.  See *Harsha*, 261 Mich at 590 (holding that the Legislature's legislative power "is co-extensive with that

---

[2] The Constitution provides that "[n]o bill shall become a law without the concurrence of a majority of the members elected to and serving in each house."  Const 1963, art 4, § 26.  In addition, the Constitution provides that "[e]very bill passed by the legislature shall be presented to the governor before it becomes law . . . ."  Const 1963, art 4, § 33.  These provisions of Article 4, § 1 are the enactment and presentment requirements of the Michigan Constitution.  See *Blank v Dep't of Corrections*, 462 Mich 103, 112; 611 NW2d 530 (2000).  Per Article 2, § 9, a law proposed by an initiative petition that the Legislature enacts is not subject to the presentment requirement.

of the parliament of England, save as limited and restrained by the State and Federal Constitutions"); *Attorney General ex rel O'Hara v Montgomery*, 275 Mich 504, 538; 267 NW 550 (1936) ("The legislative authority of the State can do anything which it is not prohibited from doing by the people through the Constitution of the State or of the United States."); *In re Brewster Street Housing Site*, 291 Mich 313, 332-333; 289 NW 493 (1939).

The majority appears to agree that Article 4, § 1's vesting of the legislative power in the Legislature means that the Legislature has the power to amend existing laws, that a law proposed in an initiative petition enacted by the Legislature is a law like any other, and that the Legislature's power under Article 4, § 1 is limited only if the Constitution expressly says so. The majority, however, suggests that Article 2, § 9 expressly limits the Legislature's power under Article 4, § 1 because Article 2, § 9 provides that "[t]he people reserve to themselves the power to propose laws and to enact and reject laws, called the initiative . . . ." And "[b]y reserving the initiative power to the people," the majority reasons, "the Constitution limits the Legislature's role with respect to initiatives to the powers expressly conferred upon it." *Ante* at 25 (opinion of the Court). In the majority's view, then, the Legislature's general legislative power under Article 4, § 1 does not apply to a law proposed in an initiative petition enacted by the Legislature, and the Legislature may do with such a law only what Article 2, § 9 expressly provides.

As an initial matter, the majority's holding does not follow from this asserted premise. If the majority were correct that the Legislature's general legislative power under Article 4, § 1 does not apply to a law proposed in an initiative petition enacted by the Legislature and that the Legislature may do with these laws only what Article 2, § 9

7

expressly provides, it would follow that the Legislature could *never* amend these laws.[3]
After all, Article 2, § 9 only expressly confers upon the Legislature the power to enact a law proposed in an initiative petition. Article 2, § 9 says nothing about whether the Legislature may amend it after the Legislature has enacted it, whether in the same or a later session. Yet despite this silence in Article 2, § 9, the majority holds that the Legislature may still amend a previously enacted law proposed in an initiative petition, just not in the same legislative session.[4] Of course, the Legislature must have the authority to amend a previously enacted law proposed in an initiative petition. The issue is that there is no language in the relevant constitutional provisions limiting the Legislature's inherent authority to do so at certain times, contrary to the majority's conclusion.

The fact that the majority's conclusion does not follow from its premise aside, I disagree that the people's reservation of "the power to propose laws and to enact and reject

---

[3] It would be unbelievable to think the Framers or the people of Michigan intended to restrict the Legislature from ever amending an initiated law previously enacted by the Legislature—a point on which the majority and I agree. If Article 2, § 9 did so, it would, in effect, allow one legislature to bind all future legislatures, and it has been long understood that such entrenchment of legislation is inconsistent with basic principles of democracy. See *LeRoux v Secretary of State*, 465 Mich 594, 615; 640 NW2d 849 (2002); *Atlas v Wayne Co Bd of Auditors*, 281 Mich 596, 599; 275 NW 507 (1937); *Detroit v Detroit & Howell Plank Rd Co*, 43 Mich 140, 145; 5 NW 275 (1880); see also Roberts & Chemerinsky, *Entrenchment Of Ordinary Legislation: A Reply to Professors Posner and Vermeule*, 91 Calif L Rev 1773, 1775 (2003) (The practice of one legislature limiting the power of another to amend or repeal statutes is "commonly referred to as legislative entrenchment and it is widely regarded as inconsistent with basic principles of democracy.").

[4] The majority brushes this off as a "slippery slope argument," but this is merely the conclusion that logically follows from the majority's premise that the inclusion of only three options for the Legislature in Const 1963, art 2, § 9 prohibits the Legislature from altering an initiative without the voters' approval.

8

laws, called the initiative," is an express limitation on the Legislature's power under Article 4, § 1. The people's reservation of "the power to propose laws and to enact and reject laws, called the initiative," merely acknowledges that the people have the right to propose a law to the Legislature through initiative petition and, if the Legislature rejects or fails to enact the proposed law within 40 session days, the right to vote whether to enact or reject the proposed law; nothing more, nothing less. If by reserving the power to propose laws the people intended to maintain exclusive legislative power over laws so proposed, why would they have given the Legislature the option to enact the proposed law—i.e., to exercise legislative power over it? Also, why would they have given the Legislature the power to amend a voter-approved initiated law by a $^3/_4$ vote of all members but not those initiated laws enacted by the Legislature itself? Finally, why would it have been necessary for the people to say in Article 2, § 9 that "[n]o law initiated or adopted by the people shall be subject to the veto power of the governor"? If by reserving the power to propose laws the people meant that they maintain exclusive legislative power over these laws, it would go without saying that the Governor cannot interfere with this power by vetoing the law. Simply put, Article 2, § 9 does not reserve to the people exclusive legislative power over a law proposed in an initiative petition enacted by the Legislature, and so there is no reason to conclude that the Legislature may do with these laws only what Article 2, § 9 expressly provides.

Finally, the majority asserts that Article 2, § 9 plainly restricts the Legislature from amending a law proposed in an initiative petition and enacted by the Legislature in the same legislative session because interpreting Article 2, § 9 otherwise "would render elements of § 9 surplusage." *Ante* at 13 (opinion of the Court). If the Legislature may

9

amend such a law, the majority reasons, the Legislature would have no reason to "propose a different measure upon the same subject by a yea and nay vote upon separate roll calls . . . ." Const 1963, art 2, § 9. In my view, the majority misapplies the canon against surplusage.[5]

First, Article 2, § 9's silence has only one plausible meaning: Article 2, § 9 does not restrict the Legislature's Article 4 power to amend laws proposed in initiative petitions that it has enacted within the 40 session days. So even if this plain meaning did render the reject-and-propose-an-alternative option surplusage, this plain meaning would still control. See *South Dearborn Environmental Improvement Ass'n, Inc v Dep't of Environmental Quality*, 502 Mich 349, 374; 917 NW2d 603 (2018) (noting that the "canon applies only

---

[5] The canon against surplusage holds that, "as a general rule, we must give effect to every word, phrase, and clause and avoid an interpretation that would render any part of the statute surplusage or nugatory." *People v Pinkney*, 501 Mich 259, 282; 912 NW2d 535 (2018) (quotation marks and citation omitted). And as the majority notes, although this is usually a rule of statutory interpretation, we have also applied this canon when interpreting our Constitution. See *Paquin v St Ignace*, 504 Mich 124, 133; 934 NW2d 650 (2019) (applying the canon against surplusage to constitutional construction); *Richardson v Secretary of State*, 381 Mich 304, 313; 160 NW2d 883 (1968) (same). This canon typically comes into play when a provision is susceptible to more than one plausible interpretation. See Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (St. Paul: Thomson/West, 2012), p 176 ("If a provision is susceptible of (1) a meaning that gives it an effect already achieved by another provision, or that deprives another provision of all independent effect, and (2) another meaning that leaves both provisions with some independent operation, the latter should be preferred."). The canon is rooted in the presumption that drafters of an instrument intend every word or phrase in the instrument to have independent meaning. But as we have said, that presumption does not always hold true: drafters do sometimes use redundant language or "engage in the retrograde practice of stringing out synonyms and near-synonyms in a belt-and-suspenders approach to ensure the inclusion of all relevant conduct . . . ." *People v Burkman*, ___ Mich ___, ___; ___ NW3d ___ (2024) (Docket Nos. 164638 and 164639); slip op at 11 n 6 (quotation marks, citation, and brackets omitted). So the canon must always "be applied with judgment and discretion, and with careful regard to context." *Reading Law*, p 176.

when a competing interpretation gives effect to every clause and word of a statute.") (quotation marks and citation omitted); Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (St. Paul: Thomson/West, 2012), p 176 ("If a provision is susceptible of (1) a meaning that gives it an effect already achieved by another provision, or that deprives another provision of all independent effect, and (2) another meaning that leaves both provisions with some independent operation, the latter should be preferred."). Second, even if Article 2, § 9 could be plausibly interpreted as restricting the Legislature from amending an initiated law previously enacted by it in the same legislative session, this interpretation would not render the reject-and-propose-an-alternative option meaningless. While a Legislature opposed to the substance of an initiated law and bent on keeping the people from voting on it might be unlikely to exercise the option of rejecting the initiated law and proposing an alternative, Article 2, § 9 still empowers the Legislature to exercise this option. This provision of Article 2, § 9, in other words, still has legal effect or independent meaning.

All in all, it is plain from the text of the Constitution that once the Legislature enacts a law proposed in an initiative petition, the Legislature may amend it in the same legislative session. Article 4, § 1 of our Constitution vests the legislative power in the Legislature, the legislative power includes the power to amend laws, and it has been always understood that the Legislature's legislative power under Article 4, § 1 is limited only if the Constitution expressly says so. Article 2, § 9 does not limit the Legislature from amending a law proposed in an initiative petition once the Legislature has enacted it, so Article 4, § 1

11

of the Constitution plainly allows the Legislature to amend it in the same legislative session.[6]

## II. THE CASELAW

The majority resists the Constitution's plain meaning in part by relying on our decisions in *Mich Farm Bureau v Secretary of State*, 379 Mich 387; 151 NW2d 797 (1967), and *Kuhn v Dep't of Treasury*, 384 Mich 378; 183 NW2d 796 (1971). The majority notes that these decisions require this Court to "liberally construe[]" Article 2, § 9 to prevent the Legislature from thwarting the people from exercising their right to propose laws through

---

[6] Citing this Court's decision in *League of Women Voters of Mich v Secretary of State*, 508 Mich 520, 541; 975 NW2d 840 (2022), the majority holds, in part, that the amended Wage Act and the amended Earned Sick Time Act were unconstitutional because they "unduly burdened voters' direct democracy rights . . . ." *Ante* at 15 (opinion of the Court). In other words, the majority seems to suggest that *League of Women Voters* held that any law or legislative action that "unduly burdens" the people's direct democracy rights under Article 2, § 9 is unconstitutional. That is not what *League of Women Voters* held. In *League of Women Voters*, we applied the settled rule that the Legislature may provide details and guidelines about how a self-executing constitutional provision is to be carried out so long as those details or guidelines do not unduly burden the right guaranteed by that provision. *Id*. at 540-541. Applying that rule in *League of Women Voters*, we held that a law requiring a petition to have no more than 15% of its signatures from any one congressional district unduly burdened the people's right to initiate laws and was therefore unconstitutional. *Id*. at 529, 531. Rather than formulate the process by which initiatives would reach the legislature or electorate, the law at issue imposed "an additional substantive requirement that [did] not advance any of the express constitutional requirements" in Article 2, § 9 for initiating a law. *Id*. at 543-544.

That said, *League of Women Voters* is irrelevant here. The amended Wage Act and the amended Earned Sick Time Act were not laws affecting the manner or process by which initiatives would reach the Legislature or electorate, and so they did not "burden" the people's right to initiate laws. They did not impose a deadline by which initiative petitions must be filed, see *Wolverine Golf Club v Secretary of State*, 384 Mich 461, 466-467; 185 NW2d 392 (1971), require that signatures for petitions come from more than one geographic area, see *League of Women Voters*, 508 Mich at 529, 531, or otherwise erect barriers in the way of the people filing initiative petitions and having them certified.

12

the initiative or to refer laws through the referendum. See *Kuhn*, 384 Mich at 385; *Mich Farm Bureau*, 379 Mich at 393-395. It is clear from those decisions, however, that we are required to do so only when the text of Article 2, § 9 at issue is ambiguous. Cf. *Browder v Int'l Fidelity Ins Co*, 413 Mich 603, 616 n 9; 321 NW2d 668 (1982) (holding that the canon stating that remedial statutes should be liberally construed applies only when the statute is ambiguous). Those decisions do not and could not suggest that this Court may add new terms to Article 2, § 9 whenever we feel those terms are necessary to protect the people against legislative maneuvering. See *Mich Farm Bureau*, 379 Mich at 393 (holding "that no court should so construe a clause or section of a constitution as to impede or defeat its generally understood ends when another construction thereof, *equally concordant with the words and sense of that clause or section*, will guard and enforce those ends") (emphasis added).

Let's begin with *Mich Farm Bureau*. Although the majority says the issue in *Mich Farm Bureau* was whether "an adopt-and-repeal scheme" was unconstitutional under Article 2, § 9, the issue there was actually how to interpret the word "within" in Article 2, § 9. This issue arose after the Legislature enacted a law exempting Michigan from daylight savings time in March 1967. See *Mich Farm Bureau*, 379 Mich at 392. In the same legislative session that the Legislature enacted this law, " 'certain individuals and groups' " submitted a petition to the Board of State Canvassers to hold a referendum on the law. *Id*.[7]

---

[7] The identity of these citizens and groups is unclear from our opinion.

13

Michigan Farm Bureau and others, the plaintiffs, sought a writ of mandamus ordering the Board of State Canvassers not to accept the referendum petition. *Id*. at 400.[8]

The plaintiffs argued that the Board of State Canvassers should not accept the referendum petition because, according to the plaintiffs, the petition was untimely under Article 2, § 9. Article 2, § 9 requires a referendum petition to "be invoked in the manner prescribed by law *within* 90 days following the final adjournment of the legislative session at which the law was enacted." Const 1963, art 2, § 9 (emphasis added). And the plaintiffs argued that this meant referendum petitions must be submitted *during* the 90 days following the end of the legislative session at which the referred law was enacted. *Mich Farm Bureau*, 379 Mich at 391-392. Put otherwise, the plaintiffs argued that a petitioner had to wait until the end of the legislative session at which a law was enacted before bringing a referendum petition against it. The petitioners here had not waited until the end of the legislative session, so the plaintiffs contended that their referendum petition was untimely.

The Secretary of State disagreed with the plaintiffs' interpretation and argued that the word "within" should be interpreted to mean "not beyond," "not later than," or "any time before." *Id*. at 393 & n 4 (quotation marks and citation omitted). Hence the Secretary of State argued that Article 2, § 9 allowed a referendum petition to be filed at any time before the end of the 90 days following the legislative session at which the referred law was enacted. *Id*. at 393.

---

[8] The majority incorrectly says that the plaintiffs in *Mich Farm Bureau* sought mandamus and injunctive relief to prevent the Legislature from adopting and then repealing the law exempting Michigan from daylight savings time.

14

This Court held that the Secretary of State's interpretation prevailed because, if the plaintiffs' interpretation were accepted, the Legislature could prevent the people from ever bringing a referendum petition against the Legislature's act exempting Michigan from daylight savings time: the Legislature could repeal the daylight savings time opt-out act in November, enact a new daylight savings time opt-out act the following March and give it immediate effect, and then again repeal the daylight savings time opt-out act the following November. The Legislature would be able to repeat this cycle indefinitely, preventing the people from ever voting on whether to approve the daylight savings time opt-out act. We therefore held that the plaintiffs' interpretation prevailed, as this would preserve the people's reserved power to referendum "against conceivable if not likely evasion or parry by the legislature":

> The issue is not without difficulty. There is nevertheless an overriding rule of constitutional construction which requires that the commonly understood referral process, forming as it does a specific power the people themselves have expressly reserved, be saved if possible as against conceivable if not likely evasion or parry by the legislature. That rule is, in substance, that no court should so construe a clause or section of a constitution as to impede or defeat its generally understood ends when another construction thereof, equally concordant with the words and sense of that clause or section, will guard and enforce those ends. [*Id*.]

Consider next our decision in *Kuhn*. The issue in *Kuhn* was how to interpret the phrase "acts . . . to meet deficiencies in state funds" in Article 2, § 9. See *Kuhn*, 384 Mich at 383. There, the Legislature had enacted the Income Tax Act, MCL 206.1 *et seq*., and included text in the statute saying that it was "for the purpose of meeting deficiencies in state funds" and that its passage was "necessary to meet established deficiencies, present and future, in state funds." *Id*. at 382-383 (quotation marks and citation omitted). But

15

Article 2, § 9 says that "[t]he power of referendum does not extend to acts making appropriations for state institutions or to meet deficiencies in state funds . . . ." Const 1963, art 2, § 9. The plaintiffs alleged that the Legislature inserted the language about the purpose of the Income Tax Act being to meet deficiencies in state funds only to prevent the people from referring it. *Kuhn*, 384 Mich at 383. The plaintiffs further alleged that there was no present deficiency in state funds when the Legislature enacted the statute, and according to plaintiffs, the phrase "deficiencies in state funds" should not encompass future deficiencies. *Id*. at 383-384. Hence the Income Tax Act should be subject to referendum under Article 2, § 9.

Accordingly, the issue in *Kuhn* was "whether the phrase 'deficiencies in state funds' in art 2, § 9 of the 1963 Constitution encompasses future deficiencies—including those virtually or actually certain to occur as a result of present appropriations—or whether the language refers only to actual deficiencies in state funds existing at the time the statute in question was enacted." *Id*. at 384. Citing *Mich Farm Bureau* for the proposition that Article 2, § 9 should be liberally construed to prevent the Legislature from thwarting the people's direct democracy rights, this Court held that an "act[] . . . to meet deficiencies in state funds" is one that the Legislature passes to meet a present deficiency in state funds:

> Applying the above principles of construction to the constitutional provision under consideration, we think the conclusion that "deficiencies in state funds" refers only to such deficiencies as exist at the time of passage of the Act in question is inescapable. If the drafters of the constitution wanted the people to more severely restrict the reserved power of referendum, they should have plainly so advised them by inserting "present or future," or some such phrase, before "deficiencies" in art 2, § 9. We may not stretch the language ratified by the people so as to allow revenue statutes to avoid the possibility of referendum by reference to *anticipated* deficiencies, resulting from future, simultaneous or even previous appropriations. Since defendants

16

have not denied there was no deficiency in state funds when the Act was passed, we hold that the Michigan Income Tax Act of 1967 was subject to referendum. [*Id*. at 385-386.]

Altogether then, our decisions in *Mich Farm Bureau* and *Kuhn* stand for the unremarkable proposition that when the text of Article 2, § 9 is unclear, we will interpret it to inhibit the Legislature from preventing the people from exercising their right to refer laws and—by extension—to initiate laws. But Article 2, § 9 is not unclear in this instance, and so this proposition is irrelevant here. In *Mich Farm Bureau*, the word "within" could be reasonably understood as fixing the beginning and end of the period in which to act or to mean "not later than." See *Mich Farm Bureau*, 379 Mich at 393 & n 4. So we presumed the people intended the latter meaning, as this would inhibit the Legislature from using a repeal-and-reenact cycle to prevent the people from ever referring the daylight savings time opt-out act. In *Kuhn*, the phrase "acts . . . to meet deficiencies in state funds" could be reasonably understood as referring to acts intended to resolve present or future deficiencies in state funds or as referring to acts intended to resolve only present deficiencies in state funds. So we presumed the people intended the latter to inhibit the Legislature from immunizing revenue acts from referendum simply by saying that such an act was "for the purpose of meeting deficiencies in state funds." Yet here, the majority identifies nothing in the text of Article 2, § 9 that could be reasonably understood as saying or implying that the Legislature cannot amend a proposed initiated law it has enacted in the same legislative session.[9] There is therefore nothing in Article 2, § 9 for this Court to "liberally construe."

_____

[9] The majority suggests that Article 2, § 9 is ambiguous merely because it does not explicitly say whether the Legislature may amend an initiated law it has enacted. See *ante* at 23 (opinion of the Court) ("As in *Kuhn*, we are tasked with interpreting the Constitution's silence. And, as in *Kuhn*, we construe that silence liberally and in favor of the people's

17

Plus, even if Article 2, § 9 could be reasonably interpreted as saying or implying that the Legislature cannot amend a proposed initiated law it has enacted in the same legislative session, it is worth noting that preferring this interpretation would not prevent the people from initiating or referring laws in the same way the rejected interpretations in *Mich Farm Bureau* and *Kuhn* would have. In *Mich Farm Bureau*, if "within" were understood as fixing the beginning and end of the period in which to act, the Legislature could have prevented the people from ever bringing a referendum petition against the daylight savings time opt-out act. See *Mich Farm Bureau*, 379 Mich at 394. Stated differently, the issue was not that the Legislature could have made it harder for the people to refer the daylight savings time opt-out act—it was that the Legislature could have prevented them from doing so altogether. Indeed, this Court in *Mich Farm Bureau* noted that, even if the people successfully referred and rejected the daylight savings time opt-out act enacted in March 1967, Article 2, § 9 would not prevent the Legislature from enacting another daylight savings time opt-out act in March 1968. *Mich Farm Bureau*, 379 Mich at

---

reserved power."). But as already discussed, Article 2, § 9's silence is not ambiguous. The people spoke clearly when they vested legislative power in the Legislature in Article 4, § 1, and so Article 2, § 9's silence can mean only one thing: the people did not intend to restrict the Legislature's power with respect to initiated laws previously enacted by the Legislature. Stated differently, because the people vested legislative power in the Legislature in Article 4, § 1, Article 2, § 9 did not need to spell out that the Legislature may amend an initiated law previously enacted by it.

Besides, even if one were to accept the majority's suggestion that Article 2, § 9 needed to spell out that the Legislature may amend an initiated law for the Legislature to be able to do so, why does the majority conclude that Article 2, § 9 allows the Legislature to amend a previously enacted initiated law in later legislative sessions? As I noted before, if Article 2, § 9 needed to spell out everything the Legislature could do, it would follow that the Legislature may never amend an initiated law it has previously enacted.

18

395-398.[10]   In the same vein, in *Kuhn*, 384 Mich at 382-383, if "acts . . . to meet

deficiencies in state funds" were interpreted as referring to acts intended to resolve present

or future deficiencies in state funds, the Legislature could have prevented the people from

ever bringing a referendum petition against any revenue act, not just have made it harder

for the people to do so.  (Quotation marks and citation omitted.)  Simply put, had this Court

endorsed these interpretations of Article 2, § 9 in *Kuhn* and *Mich Farm Bureau*, the

Legislature would have been able to completely deprive the people of their right to refer

and to express their will with regard to a specific law enacted by the Legislature or to laws

of a particular subject matter—not just hinder the people's right to do so.  See *Mich Farm

Bureau*, 379 Mich at 394-395 ("The construction claimed here by plaintiffs would permit

---

[10] The Court of Appeals highlighted this nuance in *Reynolds v Bureau of State Lottery*, 240 Mich App 84; 610 NW2d 597 (2000).  There, the petitioners had circulated a referendum petition to refer a 1994 law prohibiting political candidate committees from holding bingo fundraisers.  *Id*. at 87-88.  While the group was gathering signatures, the Legislature adopted a law in 1995 that incorporated the same language of the 1994 law.  *Id*. at 89.  In the 1996 elections, the voters rejected the 1994 law, but the 1995 law remained in place. See *id*. at 88-89.  The question before the Court of Appeals, then, was whether Article 2, § 9 restricted the Legislature from enacting a law substantively identical to one referred before the people voted on the referred law.  The plaintiffs cited *Mich Farm Bureau* and argued that Article 2, § 9 ought to be interpreted to prevent the Legislature from extinguishing or nullifying the people's right to bring a referendum.  *Id*. at 98.  Thus, the plaintiffs argued, Article 2, § 9 must restrict the Legislature from doing this.  In rejecting this argument, the panel noted that in *Mich Farm Bureau*, the hypothetical legislative scheme "could have resulted in the people never being able to formally and officially express their will on a legislative action at the ballot box in a general election."  *Id*.  Yet the legislative scheme in *Reynolds* did not completely deprive the people of their right to refer and to express their will with regard to the 1994 law.  *Id*. at 98-100.  Even if the Legislature is allowed to enact a law substantively identical to a referred law before the popular vote, the petitioners still exercised their right to refer the law, and the people still exercised their right to express their will.  *Id*. at 98-99.  Further, the panel noted that if the Legislature's substantively identical law turned out to be contrary to the popular will, the law would itself be subject to another referendum.  *Id*. at 100.

19

*outright legislative defeat*, not just hindrance, of the people's reserved right to test, by referendary process, the exemption made by Act No. 6 or any like immediate-effect exemption the legislature might enact come the showers of April each year hereafter.") (emphasis added).

In contrast here, interpreting Article 2, § 9 as allowing the Legislature to amend a previously enacted initiated law does not allow the Legislature to completely deprive the people of their right to initiate a specific law or laws of a particular subject matter, nor to express their will with regard to those laws. The people were still allowed to initiate the Wage Act and the Earned Sick Time Act and propose them to the Legislature for enactment, and the people are free to initiate future laws on the same or a similar subject. Of course, if the Legislature is allowed to amend previously enacted initiated laws, this does give the Legislature a potential way to make it harder for the people to get those laws to the ballot. But it does not give the Legislature a way to completely deprive the people of their ability to do so. If the Legislature enacts and later amends the law to keep it off the ballot, the people reserve the right to refer the amendment. And if the people do so, the original initiated law remains in effect until the people express their will on it at the polls in November.

## III. CONSTITUTIONAL HISTORY AND PURPOSE

With nothing in the text or caselaw to support its holding, the majority turns to the history and purpose of Article 2, § 9. The reason the people originally enacted Article 2, § 9 was to prevent unresponsive legislatures from disregarding the will of the people. So even if Article 2, § 9 does not explicitly limit the Legislature's power under Article 4, § 1,

20

the majority seems to reason, the people could not truly have intended to allow the Legislature to amend an initiated law in the same legislative session.

I agree with the majority that the reason the people originally enacted Article 2, § 9 was to prevent unresponsive and corrupt legislatures from disregarding the will of the people. See *League of Women Voters of Mich v Secretary of State*, 508 Mich 520, 538; 975 NW2d 840 (2022). But even with this purpose in mind, it is not inconceivable to think that the people intended to allow the Legislature to amend a law proposed by initiative petition in the same legislative session the Legislature enacts it.[11] By leaving the Legislature free to do so, the people likely understood that the Legislature would be able to amend the law in a way that promotes its underlying purpose, fills gaps overlooked by the law's sponsors, or corrects serious typographical errors.[12] Here, for instance, the Legislature could have enacted the Wage Act and the Earned Sick Time Act and then amended them to increase the minimum wage or to add extra benefits.

---

[11] I do not mean to suggest that if it were inconceivable for us to believe the people's plainly expressed intent in the constitutional text, we could alter the text or add new terms. As we noted in *In re Proposals D & H*, 417 Mich 409, 423; 339 NW2d 848 (1983), " 'The people are presumed to know what they want, to have understood the proposition submitted to them in all of its implications, and by their approval vote to have determined that this [proposal] is for the public good and expresses the free opinion of a sovereign people.' " Quoting *Keenan v Price*, 68 Idaho 423, 434; 195 P2d 662 (1948) (quotation marks omitted; alteration by the *In re Proposals* Court).

[12] One need only look at a recent dispute before this Court in *Raise the Wage MI v Bd of State Canvassers*, ___ Mich ___, ___ (May 31, 2024) (Docket No. 166312) (ZAHRA, J., concurring); slip op at 3-4, where instead of *raising* the minimum wage as the initiative proponents suggested, the petition *removed* the minimum wage for thousands of workers because of the apparently errant placement of the number "2" in a definitions section.

21

True, leaving the Legislature free to amend a law also left the Legislature free to amend it in a way inconsistent with its underlying purpose. But the people may have reasonably concluded that there were already adequate checks in the Constitution to prevent the Legislature from doing so. The people would have understood that to immediately amend an initiated law, the Legislature would have needed to have a majority in both houses of the Legislature and the Governor's support (i.e., for the Governor to not veto their amendment). And on the off chance that the stars aligned and these checks were not enough, the people knew they had reserved the right to bring a referendum petition against the Legislature's amendment. See Const 1963, art 2, § 9.[13] Considering these checks against potential abuse, then, the people might have reasonably concluded that it was better to leave the Legislature with flexibility to amend initiated laws previously enacted by it when it saw fit.

In addition, the majority ignores that the constitutional convention record suggests that the delegates—the people's representatives—were fully aware that Article 2, § 9 would not restrict the Legislature from amending an initiated law previously enacted by it. During the constitutional convention, the delegates debated whether to include the clause that now appears in Article 2, § 9 that allows the Legislature to amend a voter-approved

---

[13] Here, had the referendum been invoked against the Legislature's December 2018 amendments of the Wage Act and the Earned Sick Time Act, this would have paused those amendments from going into effect, and the original Wage Act and the Earned Sick Time Act would have remained in effect. The people would then have had an opportunity to vote whether to adopt the Legislature's December 2018 amendments at the November 2019 election. Consequently, if the Legislature's December 2018 amendments were inconsistent with the people's will, the Wage Act and the Earned Sick Time Act would have ultimately prevailed.

initiated law with a $^3/_4$ vote. Article 5, § 1 of the 1908 Constitution, the precursor to Article 2, § 9, had expressly prohibited the Legislature from amending a voter-approved initiated law. Article 5, § 1 of the 1908 Constitution expressly stated that only the voters themselves could amend it.[14] This concerned Delegate Edward Hutchinson, because if circumstances changed such that a voter-approved initiated law needed to be updated and the update needed was minor or technical, the voters would be unlikely to act on it. See Journal of the Constitutional Convention 1961, p 950; 2 Official Record, Constitutional Convention 1961, p 2396. For that reason, Delegate Hutchinson proposed allowing the Legislature to be able to amend a voter-approved initiated law by a vote of $^3/_4$ of all members of the Legislature. 2 Official Record, Constitutional Convention 1961, p 2396; see also *In re Proposals D & H*, 417 Mich 409, 429; 339 NW2d 848 (1983) (BOYLE, J., concurring). After Delegate Hutchinson proposed this, Delegate Richard Kuhn spoke in support and suggested adding language restricting the Legislature from amending a voter-approved initiated law in the same legislative session in which the voters enacted it. Delegate Hutchinson said that he was open to such language, but he and the other members of his committee did not think it was necessary:

> MR. KUHN: I was wondering if the gentleman would include in his proposed amendment something to the effect of this being done in a

---

[14] In relevant part, Const 1908, art 5, § 1 provided:

> No act initiated or adopted by the people, shall be subject to the veto power of the governor, and no act adopted by the people at the polls under the initiative provisions of this section shall be amended or repealed, except by a vote of the electors unless otherwise provided in said initiative measure, but the legislature may propose such amendments, alterations or repeals to the people.

subsequent legislative session; so we wouldn't have to worry about amending it instantly, like it provides down below in a few sentences. If we could perfect something like that, I don't think the committee would have any objection.

MR. HUTCHINSON: Mr. Chairman, if Mr. Kuhn or any other delegate would desire to offer an amendment to this amendment that way, I would be very happy to accept it. However, the reason I didn't offer it at this time is because in talking with the members of the committee, including Mr. [Tom] Downs, we thought that this $3/4$ vote requirement would be a sufficient safeguard and that the time element would become very secondary. In fact, Mr. Downs, indicated to me—and he can speak for himself on it—that he didn't know whether the time element would work out very well. [2 Official Record, Constitutional Convention 1961, p 2396.]

Some delegates spoke in favor of Delegate Kuhn's proposal to include language restricting when the Legislature could amend a voter-approved initiated law, while others thought it was unnecessary.[15] *Id*. at 2396-2397. In the end, the delegates voted to approve Delegate

---

[15] As the majority observes, Delegate Downs was one such delegate who spoke in support of Delegate Kuhn's proposal. See *id*. at 2396. Delegate Downs explained that he supported the $3/4$ requirement because it would prevent the Legislature from altering the basic substance of an initiated law just after it was approved by the voters:

Mr. Chairman, fellow delegates, I believe that Delegate Hutchinson pointed out what technically and theoretically could be a problem; that if the initiative process got something into the statutes, and then a technical amendment was wanted later on, it would be almost impossible. Now, what we wanted to guard against, and I felt very strongly about it, was a situation where the people go to all the effort of an initiative campaign, which is hard work, win it, and then have the legislature by a 51 per cent vote reverse it. I think that the protection of the $3/4$ would be such that it would mean the change would not be on the basic substance of what the people had gotten through the initiative process, but on what Delegate Hutchinson has referred to: some technical part that might need to fit into some other statute. Therefore, I think the $3/4$ is a reasonable requirement. I prefer it a little bit to the time concept. I think it is a little better way to handle the problem. I therefore will speak in support of the amendment. [*Id*.]

24

Hutchinson's proposal without language restricting when the Legislature could amend a voter-approved initiated law. *Id.* at 2397.

On the whole, this shows that the delegates understood that the Legislature would be able to amend a voter-approved initiated law at any time unless they included language in Article 2, § 9 saying otherwise. One can reasonably infer, therefore, that they also understood that the Legislature could amend a law proposed in an initiative petition enacted by the Legislature at any time unless language in Article 2, § 9 said otherwise.

Bolstering this inference are some comments made by Delegate Kuhn during a debate about whether Article 2, § 9 should require 5% or 8% of the electorate to sign an initiative petition. Delegate Kuhn spoke in favor of the 8% requirement, which is what Article 5, § 1 of the 1908 Constitution had required. When speaking in favor of this requirement, Delegate Kuhn made comments showing that he understood that the Legislature retains legislative power over a law proposed in an initiative petition it has enacted:

> Yes, it's true, Michigan says 8 per cent. Why is this important? It's important because the legislative power should be in the house and senate. Now, if they do not see fit to move on a proposition that the people seem to think is important, then the people have a right. It was only used once successfully. Now, this doesn't mean that it is not a good thing; because the legislature can always keep this in the back of their minds.
>
> I think it is also interesting to note this. I know we do not have a lot of time to explain this very complicated thing, but what are the rights of the

---

I agree with the majority that Delegate Downs's comments suggest that delegates were concerned generally about the possibility of legislative maneuvering. But again, Delegate Downs's comments further show that the delegates understood Article 2, § 9 would not restrict the Legislature from amending an initiated law—enacted either by the Legislature or the people at the polls—unless they included explicit language in Article 2, § 9 saying that the Legislature could not do so.

legislature after the people start this petition and have the 10 per cent of the people who voted for governor?  They must accept it within 40 days, and accept it in toto, or they must place it on the ballot.   Now, what happens if they place it on the ballot and the people adopt it?   They lose control of it.  They can't amend it, they can't repeal it, and they can't change it in any way unless the people give them consent in their initiative petition, or unless they go back to the people and ask them to do this.   This makes it rather strong.

The only time we have had an initiative matter that went through was the oleomargarine back in 1950.   *The legislature saw what the people wanted, and had the pulse and feeling, and adopted it to get away from this control factor so that they could keep control of the matter.*

This is a very good thing.  It's tough.  We want to make it tough.  It should not be easy.  The people should not be writing the laws.  That's what we have a senate and house of representatives for.  But they should have the power, which they do not have in our federal government, but they do have it in this matter, and we are asking you to retain the committee's position and keep it at 8 per cent.   [2 Official Record, Constitutional Convention 1961, p 2394 (emphasis added).]

Even more, when Delegate Eugene Wanger questioned Delegate Kuhn to clarify the differences between an initiative and referendum, Delegate Kuhn explicitly said that Article 2, § 9 would not restrict the Legislature from amending a law proposed in an initiative petition that the Legislature had enacted:

MR. WANGER: Yes.   A brief question for Mr. Kuhn, Mr. Chairman.  Mr. Kuhn, isn't there another difference between initiative and referendum, namely:  that referendum cannot result in having a statute on the books which it takes a popular vote to repeal?   Whereas, the initiative, if the initiated statute is adopted, means that the people, in order to make any changes in that statute, have to vote; and the legislature cannot vote to change it.

MR. KUHN: Well, not exactly.    I'll try to explain this a little bit, Mr. Wanger.  *If the legislature sees fit to adopt the petition of the initiative as being sent out, if the legislature in their wisdom feel it looks like it is going to be good, and they adopt it in toto, then they have full control.   They can amend it and do anything they see fit.*  But if they do not, and you start an initiative petition and it goes through and is adopted by the people without

26

the legislature doing it, then they are precluded from disturbing it.
[2 Official Record, Constitutional Convention 1961, p 2395.]

While Delegate Kuhn is of course only one delegate, if his understanding of the interplay between Article 4, § 1 and Article 2, § 9 were inconsistent with the understanding of the other delegates, it is reasonable to assume that someone would have corrected Delegate Kuhn or at least at some point offered a different view.

In short, to the extent that a constitutional provision's general purpose could ever trump the Constitution's text, this is not such a case. This is not a case in which the text is so inconsistent with the constitutional provision's purpose that it would be unbelievable to think the plain meaning is what the people actually intended. And the constitutional convention record suggests that the delegates—the representatives of the people—were aware that Article 2, § 9 would not restrict the Legislature from amending a law proposed in an initiative petition enacted by the Legislature.[16] This is not something that the delegates merely overlooked.

---

[16] Given that Attorney General Frank Kelley's opinion conflicts with the constitutional convention record, I disagree with the majority's reliance on Attorney General Kelley's opinion as persuasive. Shortly after the people ratified the 1963 Constitution, Attorney General Kelley issued an opinion stating that "[i]t is . . . clear that the legislature enacting an initiative petition proposal cannot amend the law so enacted at the same legislative session without violation of the spirit and letter of" Article 2, § 9. 1 OAG, 1964, No. 4,303, p 309, at 311 (March 6, 1964). Like the majority here, Attorney General Kelley identified nothing in the text of Article 2, § 9, or really any evidence at all, to support his conclusion. Yet the majority finds his opinion persuasive because it "has the benefit of providing us with insight into what the framers intended," given that Attorney General Kelley rendered it just after ratification. I struggle to understand how the majority can conclude that Attorney General Kelley's opinion more accurately reveals the Framers' intent than what the Framers themselves said at the constitutional convention.

The majority remarks that in 1963, the people could not have foreseen the Legislature doing what it did here: enacting a law proposed in an initiative petition and amending it out of existence during a lame-duck session. By pointing this out, the majority suggests that the people would have expected the Legislature to enact the law only if the Legislature actually agreed with it—not just to later amend it out of existence and keep it off the ballot. This Court, however, is without power to add new terms to the Constitution to conform it with what we believe the people would have intended had they possessed better foresight. See *In re Proposals D & H*, 417 Mich at 423 ("Fundamental principles of democratic self-government preclude the judiciary from substituting its judgment for that of the people."). When we interpret the Constitution, the question is what the people intended based on the language they ratified, not what we believe the people would have intended had they foreseen all the implications of the language or the absence thereof. See *American Axle*, 461 Mich at 362.

Besides, even if the people would have expected the Legislature to enact an initiated law only if the Legislature agreed with the law, and even if we could add new terms to the Constitution to conform it to this expectation, the majority's holding today falls short. To see why, a bit of background is helpful. Each Legislature has a two-year tenure, starting in odd-numbered years. See Const 1963, art 4, § 3 (stating that the Michigan House of Representatives is subject to elections every two years); Const 1963, art 2, § 5 ("Except for special elections to fill vacancies, or as otherwise provided in this constitution, all elections for national, state, county and township offices shall be held on the first Tuesday after the first Monday in November in each even-numbered year or on such other date as members of the congress of the United States are regularly elected."). A single legislative session

28

usually lasts about one year. See Const 1963, art 4, § 13 ("The legislature shall meet at the seat of government on the second Wednesday in January of each year at twelve o'clock noon. Each regular session shall adjourn without day, on a day determined by concurrent resolution, at twelve o'clock noon."). That said, each Legislature has two legislative sessions during its tenure. The tenure of the Legislature that enacted the Wage Act and the Earned Sick Time Act—the 99th Legislature—lasted from January 2017 until the end of December 2018. See MCL 168.173 ("The term of office of state senator and representative shall commence at 12 noon on January 1 next following his election.").

If a law is initiated in the first legislative session of a Legislature's tenure (i.e., 2017), under the majority's holding, the Legislature may enact the law, wait until the legislative session ends, and then gut the law in the second legislative session of that Legislature's tenure—anytime in 2018. So had the Wage Act and the Earned Sick Time Act been initiated in August 2017 rather than August 2018, according to the majority, the 99th Legislature would have been free to gut these acts anytime during the 2018 legislative session. If a law is initiated in the second legislative session of a Legislature's tenure, under the majority's holding, the sitting Legislature may enact the law, and the next Legislature may gut the initiated law as soon as it takes office in January of the next year.[17] So according to the majority, the 100th Legislature could have gutted the Wage Act and the Earned Sick Time Act in January 2019—merely a month later than when the 99th Legislature actually did so. All said, then, if a Legislature opposes an initiative and wishes

---

[17] To be sure, a change in the Legislature's composition or the governorship after the biannual November elections may diminish the likelihood of the next Legislature doing so. But the fact remains that the next Legislature has the power to do so under the majority's holding.

to keep it off the ballot, the majority's holding today will not stop that Legislature or the next Legislature from enacting the initiative and later amending it out of existence. If the majority truly sees Article 2, § 9's silence as a breach in the constitutional wall that the people overlooked when they ratified it, I struggle to understand why the majority believes they have sealed it with today's opinion. The majority has offered no discernible explanation for this.

## IV. CONCLUSION

The majority has failed to justify its holding that Article 2, § 9 allows the Legislature to amend a law proposed in an initiative petition after enacting it but that the Legislature may not amend it in the same legislative session. In Article 4, § 1, the people unequivocally empowered the Legislature to amend laws, including laws proposed in an initiative petition enacted by the Legislature, and the people chose not to restrict the Legislature's power to do so in Article 2, § 9. The Legislature was therefore allowed to amend the Wage Act and the Earned Sick Time Act in the same legislative session. This is not to say that the Legislature acted honorably or uprightly by doing so; it is only to say that the Legislature did not act unconstitutionally. This Court's job is to interpret the Constitution and decide whether the Legislature acted within the Constitution's bounds, not to judge whether the Legislature used its power fairly or in good conscience. See *Kuhn*, 384 Mich at 383 ("Courts are not concerned with the motives which actuate the members of the legislative body in enacting a law but only in the results of their actions.") (quotation marks and citation omitted); Cooley, Constitutional Law (1880), p 154 ("The validity of legislation can never be made to depend on the motives which have secured its adoption, whether

30

these be public or personal, honest or corrupt. There is ample reason for this in the fact that the people have set no authority over the legislators with jurisdiction to inquire into their conduct, and to judge what have been their purposes in the pretended discharge of the legislative trust."). Because I do not believe that the Constitution prohibits the Legislature from amending a law in the same legislative session in which that law was proposed in an initiative petition, I believe that the majority's actions today go beyond this Court's constitutional authority. I therefore would have affirmed the judgment of the Court of Appeals. For those reasons, I dissent.

Elizabeth T. Clement
Brian K. Zahra
David F. Viviano

31

STATE OF MICHIGAN

SUPREME COURT

MOTHERING JUSTICE, MICHIGAN ONE
FAIR WAGE, MICHIGAN TIME TO
CARE, RESTAURANT OPPORTUNITIES
CENTER OF MICHIGAN, JAMES HAWK,
and TIA MARIE SANDERS,

        Plaintiffs-Appellants/
        Cross-Appellees,

v                                      No. 165325

ATTORNEY GENERAL,

        Defendant-Appellee/
        Cross-Appellant,

and

STATE OF MICHIGAN,

        Defendant-Appellee.

_____

ZAHRA, J. (*dissenting*).

Despite the extensive authority of the Legislature to enact statutes in the public interest

absent narrow constitutional limitations,[1] despite the complete lack of constitutional language

---

[1] Const 1963, art 4, § 1; *Taxpayers of Mich Against Casinos v Michigan*, 471 Mich 306, 328; 685 NW2d 221 (2004) (" 'The legislative power, under the Constitution of the State, is as broad, comprehensive, absolute and unlimited as that of the parliament of England, subject only to the Constitution of the United States and the restraints and limitations imposed by the people upon such power by the Constitution of the State itself.' "), quoting *Young v Ann Arbor*, 267 Mich 241, 243; 255 NW 579 (1934).

preventing the Legislature from amending an adopted initiative,[2] despite the extensive constitutional record supporting the Legislature's "full control" over adopted initiatives,[3] and despite the total absence of caselaw limiting legislative prerogatives when the text of Article 2, § 9 is otherwise silent,[4] the Court declares amendments to the Improved Workforce Opportunity

---

[2] Const 1963, art 2, § 9 is very explicit when it *limits* authority otherwise granted to the Legislature and the Governor. See, e.g., Const 1963, art 2, § 9 (stating that "[n]o law *initiated* or adopted by the people" is subject to gubernatorial veto, but only laws "adopted by the people" are protected from legislative amendment absent a $^3/_4$ vote) (emphasis added); *id*. (explicitly saying that the Legislature is prohibited from amending a statute until the "subsequent session" when a law is "approved by the people under the referendum provision").

[3] 2 Official Record, Constitutional Convention 1961, pp 2393-2396 (providing extensive convention discussions on the import of restrictions on the ability to amend voter-approved initiatives, given the ability of the Legislature to adopt the legislation in the first place and maintain "full control" of the statute); see also Committee on Legislative Powers, Minutes and Action Journal No. 38 (April 10, 1962), p 3 (rejecting worries that the bar to amend voter-approved initiatives was too high because the Legislature could "maintain control" through adoption).

[4] See, e.g., *Mich Farm Bureau v Secretary of State*, 379 Mich 387, 393-394, 396-397; 151 NW2d 797 (1967) (correctly interpretating express language in Article 2, § 9 to permit citizens to propose initiatives prior to the end of the legislative session, but also recognizing the "reserved power" of the Legislature to enact "exactly the same subject" of a law subject to referendum and therefore suspended pending an election, given that "[n]owhere in the constitution" was the Legislature's power so limited) (quotation marks and citations omitted); *Kuhn v Dep't of Treasury*, 384 Mich 378, 385; 183 NW2d 796 (1971) (accurately interpreting the plain text of Article 2, § 9, which prohibits referendums on statutes "to meet deficiencies in state funds," to apply only to actual and current deficiencies, not projected or potentially speculative deficiencies at some point in the future, thereby allowing a properly enacted law to be subject to referendum); *Mich United Conservation Clubs v Secretary of State (After Remand)*, 464 Mich 359; 630 NW2d 297 (2001) (despite purported concerns of legislative abuse, concluding that the Legislature had the authority to pass a law deregulating concealed-carry-permit laws with funding for a "state institution," thereby excluding the provision from referendum under the plain language of Article 2, § 9).

By contrast to *Mich Farm Bureau* and *Kuhn*, the majority opinion is restricting the inherent authority of the Legislature to legislate in the public interest without any requirement or condition in the text of the Michigan Constitution. See *Mich Farm Bureau*, 379 Mich at 394

Wage Act and the Earned Sick Time Act unconstitutional. In so doing, it does not hold that adopt-and-amend is unconstitutional; it cannot so hold given the text of the Michigan Constitution and considering the effective functioning of a constitutional system.[5] Instead, the majority opinion superimposes on the Michigan Constitution a requirement that an initiative adopted by the Legislature cannot be amended within the "same legislative session,"[6] abrogating with precision the minimum-wage and sick-time legislation enacted in late 2018. In the process, the majority opinion leaves later Legislatures free to adopt and amend as they please under this

_____

(holding that the plain meaning of the textual requirement in Article 2, § 9 to file a referendum "within 90 days" of a legislative session did not justify "outright legislative defeat," beyond acceptable "hindrance[s]," of the right to referendum by filing a referendum prior to the close of session); *Kuhn*, 384 Mich at 385-386 (reasoning that "[w]e may not *stretch the language* ratified by the people so as to allow revenue statutes to avoid the possibility of referendum by reference to *anticipated* deficiencies," and when analyzing the text of Article 2, § 9, holding that this conclusion was "inescapable") (first emphasis added).

[5] If the Legislature were restricted from amending any law that was enacted through the initiative process without a vote from the public, one body of the Legislature could bind or severely limit later legislative enactments through the signatures of a distinct minority of citizens (often special interests), notwithstanding changed circumstances, information, or the inevitable change in the Legislature's membership. See *LeRoux v Secretary of State*, 465 Mich 594, 615; 640 NW2d 849 (2002) ("It is a fundamental principle that one Legislature cannot bind a future Legislature or limit its power to amend or repeal statutes."); see also Const 1963, art 4, § 54 (establishing term limits for state legislators). Given the ability to organize and effectively gather signatures from a small minority of the population, the Legislature could also use an initiated proposal to avoid gubernatorial oversight for major legislation, which would then be shielded from change for potentially significant periods of time. See *Immigration & Naturalization Serv v Chadha*, 462 US 919, 946; 103 S Ct 2764; 77 L Ed 2d 317 (1983) (explaining that presentment clauses are "integral parts of the constitutional design for the separation of powers"). The signatures of merely 8% of the voting public and the vote of a fleeting legislative majority could bind Michigan's elected branches for years, if not generations.

[6] *Ante* at 2 (opinion of the Court).

3

Court's newly devised guideposts.[7] Given the majority opinion's novel and legally unsupported "same legislative session" rule, and the attendant conclusion that the laws at issue are unconstitutional, the Court is now left in a quandary. Generally speaking, in those rare instances when a statute is declared unconstitutional, the Court closely analyzes the law to save as much of the statute from invalidity as possible.[8] By severing unconstitutional provisions, the Court preserves "legislative intent"[9] while also preventing the Court from being thrust into "judicial policymaking or *de facto* judicial legislation . . . ."[10] But after misinterpreting the Michigan Constitution and issuing its erroneous decision on the merits, the Court is left unable to sever unconstitutional provisions. Instead, two statutory acts expressly and unequivocally approved by the Legislature and signed by the Governor are now declared unconstitutional in toto.

---

[7] In Michigan, legislative elections occur biannually. Const 1963, art 4, § 3 (stating that the Michigan House of Representatives is subject to elections every two years). By contrast, legislative sessions occur annually. Const 1963, art 4, § 13 ("The legislature shall meet at the seat of government on the second Wednesday in January of each year at twelve o'clock noon."). As a result of today's decision, future Legislatures, even those retaining the same membership, are free to amend or repeal a law adopted in a prior session and can do so with immediate effect. Const 1963, art 4, § 27 ("[T]he legislature may give immediate effect to acts by a two-thirds vote of the members elected to and serving in each house."). When the Legislature amends or repeals the law, the initiative proposal as originally written would not be presented to the voters for approval, like the enactments at issue in this case.

[8] *In re Request for Advisory Opinion*, 490 Mich 295, 345; 806 NW2d 683 (2011) ("This Court has long recognized that it is the law of this State that if invalid or unconstitutional language can be deleted from an ordinance and still leave it complete and operative then such remainder of the ordinance be permitted to stand.") (quotation marks and citation omitted).

[9] *People v Lockridge*, 498 Mich 358, 390; 870 NW2d 502 (2015).

[10] *Barr v American Ass'n of Political Consultants, Inc*, 591 US 610, 626; 140 S Ct 2335; 207 L Ed 2d 784 (2020) (applying the highly analogous federal standard).

Lacking any ability to limit its holding to certain individuals[11] or the ability to sever provisions while saving the remainder of the acts, this Court has two options. It can declare the relevant statutes void, or it can revive earlier versions of the statutes in their entirety to the extent it is consistent with legislative intent.

Yet the Court chooses neither of these options. Instead, the Court abrogates the statutes the Legislature chose to enact, revives the outline of laws that the Legislature rejected, and wholesale rewrites the substance of those revived laws in a manner detached from the express statutory language and guided only by what the Court views as "equitable."[12] Ironically, the majority opinion declares the Legislature's attempt to adopt and amend unconstitutional, yet it uses its judicial power to revive and amend the initiative that was intended to be placed on the ballot for public consideration. In the clearest way possible, the Court exercises legislative power, drafting new legislation that has *never* been approved by the Legislature or approved by the voters. Without a single vote of support from the elected Legislature or the citizens, this Court has now written the public policy of this state as to minimum wages, tipped wages, and earned sick time. Because the remedy chosen by the majority lacks support in the law of this state and improperly encroaches on the authority constitutionally provided to the Legislature, I dissent.

---

[11] See *Bonner v Brighton*, 495 Mich 209, 223 n 27; 848 NW2d 380 (2014) ("An as-applied challenge, to be distinguished from a facial challenge, alleges a present infringement or denial of a specific right or of a particular injury in process of actual execution of government action.") (quotation marks and citation omitted).

[12] *Ante* at 30-31 (opinion of the Court).

## I. ANALYSIS

When declaring statutes enacted by the Legislature unconstitutional, consideration of remedies such as statutory revival is ultimately a question of legislative intent.[13] And it is well accepted that the "touchstone of legislative intent is the statute's language,"[14] not speculation on "an unstated purpose."[15] At common law, the presumption was that removal of a repealing or amendatory act revived the former statute.[16] However, for many years the Legislature has abrogated that common-law preference, mandating that any repealed statute "shall not be revived by the repeal of such subsequent repealing statute."[17] Beyond this, in recent decades courts that have held legal provisions to be unconstitutional in full have made no attempt to revive an earlier version of the law, which had at that point been rejected by the Legislature, overridden, and fallen into disuse.[18] As this Court explained in *Betts*, in the context of a complex and

---

[13] *People v Betts*, 507 Mich 527, 573; 968 NW2d 497 (2021) (" '[T]he touchstone for any decision about remedy is legislative intent, for a court cannot use its remedial powers to circumvent the intent of the legislature.' "), quoting *Ayotte v Planned Parenthood of Northern New England*, 546 US 320, 330; 126 S Ct 961; 163 L Ed 2d 812 (2006); accord *Lockridge*, 498 Mich at 390 (in the context of severance).

[14] *People v Gardner*, 482 Mich 41, 50; 753 NW2d 78 (2008).

[15] *Pohutski v City of Allen Park*, 465 Mich 675, 683; 641 NW2d 219 (2002).

[16] See *Bender v United States*, 93 F2d 814, 816 (CA 3, 1937); 73 Am Jur 2d, Statutes (May 2024 update), § 253 (describing the common-law rule and emphasizing the importance of "the intention of the legislature").

[17] MCL 8.4; see also 1 USC 108 (federal statute enacting the same rule).

[18] See, e.g., *Betts*, 507 Mich 527; *In re Certified Questions from US Dist Court*, 506 Mich 332; 958 NW2d 1 (2020) (invalidating statutes on executive emergency powers without any mention or discussion of reviving a preexisting version of a statute); *In re Apportionment of State Legislature—1982*, 413 Mich 96, 138-139; 321 NW2d 565 (1982) (concluding that provisions in the Michigan Constitution creating a commission for legislative apportionment were not severable from unconstitutional provisions, thus placing the law into a state as though the

sophisticated sex-offender-registry statute with shifting requirements and nuanced legislative balances, reviving a previous version of a statute no longer in effect would conflict with the "Legislature's intent."[19]

Very similar analysis could be applied in this case. In the legal context of this dispute, the Legislature clearly did not intend to approve and enact with continuing effect the initiative versions of the Improved Workforce Opportunity Wage Act and the Earned Sick Time Act. Although at first the Legislature approved those initiatives, the initiatives marked significant changes in employee–employer relations that were ultimately rejected by the Legislature in the process of revisions and amendments prior to the statutes ever taking effect. That is very strong evidence that the Legislature did not intend the repealed and never effective laws to be revived.[20]

---

provisions on the subject never existed); *Murphy v Nat'l Collegiate Athletic Ass'n*, 584 US 453; 138 S Ct 1461; 200 L Ed 2d 854 (2018) (holding that an entire federal statute on sports gambling was unconstitutional and neither reviving a prior version of the statute nor declaring that previous statutory enactments return into effect).

[19] *Betts*, 507 Mich at 573-574.

[20] Although not controlling for an inquiry into remedy, it is noteworthy that the Legislature chose not to place an alternative bill on the ballot for public consideration. See *ante* at 14 n 12 (opinion of the Court) (noting this dissent's discussion of the Legislature's replacement of significant portions of the initiative with the amendatory acts). That was a policy choice by our elected Legislature, just as it would be a policy choice to include state funding in the same bill as gun-license deregulation or to reenact a statute subject to a referendum, rather than allowing a referendum vote to proceed in the first instance. See *Mich United Conservation Clubs*, 464 Mich 359; *Mich Farm Bureau*, 379 Mich 387. Unlike placing an alternative law on the ballot, the Legislature passed laws on the public record that replaced the original initiatives in material part before they ever became effective, obtained gubernatorial approval to do so, and subjected those amendments to referendum—or, indeed, to subsequent alteration by the Legislature or by adopted initiative. If the Legislature placed an alternative on the ballot, none of those processes or limitations would have been implicated, and the Legislature's alternative could have been approved by the electorate, which would significantly insulate that legislation from further amendment by future Legislatures. Placing an alternative on the ballot would have allowed the Legislature to affirmatively resolve the issue and cement its chosen alternative as the law of the

7

The amended law provides carefully delineated and marginal increases to the minimum wage. By contrast, the initiative law included few set caps and limitations, allowing the minimum wage to rise at the rate of inflation, and the resulting differences between those rates over the course of time is stark. While under the Legislature's chosen policy, expressed through amendments, the minimum wage would be $10.80 in 2025,[21] it would be around $13.80 under the initiative version of the law the Legislature rejected and likely around $12.50 under the revisions to the statute drafted in the majority opinion. Assuming a modest 3% annual rate of inflation, by 2030 the amended law enacted by the Legislature would provide for a $12.05 minimum wage, as compared to approximately $16 in the initiative version of the law and around $15.4 under the law written by the Court's majority. An increase in the minimum wage ranging between 15% to 32% is a major policy judgment traditionally left to the Legislature.

But that is just the tip of the iceberg. The initiative version of the minimum-wage law slowly eliminated the legal distinction between tipped and nontipped labor, eventually requiring all of a tipped employee's minimum wages to be paid by their employer, rather than through tips and their employer. Given the increased burden on employers with lower-priced goods such as

---

state, protected by a $^3/_4$ supermajority vote requirement for legislative amendment. These two methods of enactment are completely distinct, with their own limits, processes, and effects. This Court cannot change the meaning or methods of statutory enactment under the Michigan Constitution, and the Legislature chose to amend the initiative proposal using a standard legislative enactment rather than placing the alternative on the ballot. Even if the majority does not approve of the choice of the political actors at issue or believes it is prone to abuse, that does not render it unconstitutional under the Michigan Constitution. See *Immigration & Naturalization Serv v Chadha*, 462 US 919, 959; 103 S Ct 2764; 77 L Ed 2d 317 (1983) ("With all the obvious flaws of delay, untidiness, and potential for abuse, we have not yet found a better way to preserve freedom than by making the exercise of power subject to the carefully crafted restraints spelled out in the Constitution.").

[21] MCL 408.934(1)(*l*).

restaurants, this law would facially alter the labor relationship between tipped employees, their employers, and customers. Customers and businesses are likely to react to increased salary burdens for tipped labor by reducing the use of tipping as a primary source of income for many workers, specifically for those workers who make entry-level or near-minimum wages. This increased burden will likely be at the cost of lower overall wages for many workers as tips are replaced with employee salaries and, to some degree, less employment for employees whose wages were previously reliant on tips.[22] None of these foundational alterations of tipped labor were included in the amended statute adopted by the Legislature.

The initiative version of the Earned Sick Time Act created an entirely new entitlement that workers could seek from their employer. The Legislature amended it to be substantially more tailored, limiting, for example, mandates on small businesses and for part-time labor. The initiative version of the law established for the first time a broad-reaching entitlement to sick time for any employee, accruing at a rate of one hour of sick time per 30 hours, uncapped but limited to 72 hours of used sick time per year. The accrued sick time carried over in full year to year. When the employee accrued more than 40 paid sick-leave hours in a year, provisions for

---

[22] Polling by the Michigan Restaurant and Lodging Association indicates that 61% of restaurant operators in Michigan estimated that they would lay off more than 25% of their tipped employees if the minimum-wage offset is substantially reduced or eliminated. Michigan Restaurant and Lodging Association, *Polling Memo: The Impacts of Tip Credit Elimination* (September 2022), p 4, available at <https://www.mrla.org/uploads/1/2/1/3/121332115/mlra_impactsoftippedwageelimination.pdf> (accessed May 23, 2024) [https://perma.cc/K6BK-UB9M]. Concurrently, polling showed that a substantial majority (75%) of tipped employees believe that they will earn less if they make their wages through employer payments instead of customer tips. Ninety-four percent of workers polled believed that customers will tip less if the workers are paid primarily through their employer. Corder, *Michigan Restaurant Tipped Worker Survey: Impact of Eliminating the Tip Credit on Income and Job Security* (September 2022), pp 9-10; *id*. at 11 (finding that 83% of tipped workers would prefer a system "with a lower base wage and tips").

"small business" allowed 32 out of the 72 hours to be unpaid sick time. The definition of "small business" was a firm with less than 10 employees.

The Legislature significantly amended the contours of this new mandated benefit created by the initiative. As amended, the law did not apply at all to employees working less than 25 hours per week or who worked less than 25 weeks in a year. It did not apply to professionals exempted from overtime requirements of the Fair Labor Standards Act. It did not apply to young trainees and those under 18 years old, who are subject to exceptions from the minimum wage, or those subject to a collective-bargaining agreement negotiated by a union. The amended law excluded businesses that employ 50 or fewer employees from the mandates; imposed on employers benefit accrual at one hour of sick leave for every 35 hours, instead of 30 hours in the initiative version; and permitted employers to cap accrual at 40 hours per year, as compared to no cap in the initiative version, and to cap use of sick leave at 40 hours per year, as compared to 72 hours. Other amendments were made, including permission for the employer to institute procedures of notice and formal request of sick leave.

Whether the amendments were wise policy is totally irrelevant to this Court's inquiry. It is apparent that the amendments marked a massive departure on highly technical and nuanced employment-law statutes, implicating intricate legislative balances. The Legislature clearly did not approve of the significant rise in the minimum wage, unmoored from express statutory steps and based almost entirely on inflation. Nor did it approve of the elimination over the course of time of fundamental legal distinctions between tipped and nontipped labor, nor the establishment of substantially expanded earned-sick-leave mandates, reaching broadly across wide swaths of the labor market. The policy choices reflected in the amended laws passed both chambers of the Legislature and were signed into law by the Governor. They remained law up until today, despite

10

numerous changes in the membership of the legislative branch and a change in the executive branch.

The central question is whether the Legislature would have intended to revive completely different statutes, which varied widely from the statutory language ultimately chosen by the Legislature. The majority opinion nowhere mentions or discusses what the Legislature would have intended. No material analysis on the nature and scope of the amendments, and comparing them to objective demonstrations of legislative intent, is provided in the majority opinion. The majority opinion openly acknowledges that it ignores legislative intent[23] and instead references as support the "purpose" of the "*original initiative*[]."[24] But the initiative proposal is not the law, nor has it ever been the effective law of this state. Implicit, if not openly stated, in the majority opinion's analysis is that the Court can disregard the Legislature's intent because the Legislature was composed of bad actors and creators of "constitutional mischief" in the view of four members of this Court.[25] Without citation to legal authority, the majority opinion reasons that a discussion of legislative intent can be avoided because the law ultimately enacted by the Legislature was unconstitutional.[26] Given that only the Constitution supersedes statutes, the law establishing the proper remedies for illegal statutes is derived almost exclusively from

---

[23] *Ante* at 31 n 19 (opinion of the Court) (explaining that the Court can ignore legislative intent because the Legislature violated the Constitution).

[24] *Ante* at 32 (opinion of the Court) (emphasis added); *ante* at 30 (opinion of the Court) (weighing employers' needs against "the people's rights to the initiative"); see also *ante* at 31 n 19 (opinion of the Court).

[25] *Ante* at 30 (opinion of the Court).

[26] *Ante* at 31 n 19 (opinion of the Court).

constitutional violations.[27]  The majority opinion's reasoning is circular and internally inconsistent.  No matter how much this Court disapproves of the political actions of the Legislature, the legal standard employed in the majority opinion to arrive at the remedy for purportedly unconstitutional statutory provisions is fabricated from an unprecedented expansion of judicial power.  The majority opinion fails to cite a single case in the history of Michigan where the Court considers revival, or a wholesale rewrite of a statute, based on the intent and purposes of a statute or law *that was replaced or repealed*.  The people, upon whose intent the majority opinion purportedly relies, neither enacted the initiative proposals into law nor voted to approve them.  The majority opinion's attempt to glean the public's intent from a very small minority of citizens who signed the petitions at issue amounts to pure speculation.[28]  The intent of the Legislature when it enacted a prior version of a statute, potentially years or decades past in some instances, is simply irrelevant to whether the Legislature would have preferred that version to be the law if the statute the Legislature *actually enacted* were displaced.[29]

---

[27] See, e.g., *Betts*, 507 Mich 527 (considering a constitutional violation); *Lockridge*, 498 Mich at 390 (same); *In re Certified Questions from US Dist Court*, 506 Mich 332 (same); *Murphy*, 584 US 453 (same); *People v Smith*, 246 Mich 393; 224 NW 402 (1929) (same); see also *Ayotte*, 546 US at 328-329 (describing basic principles of remedy in the context of "a constitutional flaw in a statute").  Similarly, the fact that the prior law was constitutional, which is the default for all statutes, does not demonstrate that the Legislature would have preferred revival as a remedy when an amendatory or repealing statute is declared unconstitutional.  See *In re Request for Advisory Opinion*, 479 Mich 1, 11; 740 NW2d 444 (2007) ("A statute challenged on a constitutional basis is clothed in a presumption of constitutionality . . . .") (quotation marks and citation omitted); *ante* at 34 n 24 (opinion of the Court) (noting the constitutionality of the original initiative to support the majority opinion's chosen remedy).

[28] That notwithstanding the fact that no one—not even the signatories of the initiative—has approved or enacted the statutes as rewritten by the majority opinion.

[29] If the Court looked only at the intent of those who enacted the law originally, *every* original version of a statute would be revived, no matter how long the passage of time has been, the

12

At least as to the Earned Sick Time Act, it appears probable that the Legislature would have preferred no statute on the subject rather than the creation of an extraordinarily broad benefit mandate included in the initiative proposal, which the Legislature substantially tailored and limited in a subsequent amendment.[30]  The same could readily be said of the tipped-wage provisions in the initiative proposal.  While a far closer question, it is possible if not probable that the Legislature would have preferred a version of the minimum-wage levels that existed prior to the initiative, rather than the initiative itself.  The law that existed prior to the initiative tied raises to inflation but capped the raise at 3.5% per year and started from a lower base point.[31]  A complete review of the complexity, alterations, and exceptions created by the Legislature's amendments of the initiative provisions strongly supports the notion that the Legislature would have approved the Michigan minimum-wage law in existence before the initiative proposal was enacted.  Given that the minimum-wage statutes prior to the initiative were not repealed but were instead "supersede[d]" by the initiative proposal, the law prior to the initiative would apply if the initiative did not come into effect.[32]  Without the initiative or the amendments of the

---

inapplicability or disuse of the original law's provisions in modern life, or its fundamental conflict with the intent of the Legislature.

[30] Abrogation of applicable law is by no means unheard of.  In prior decisions invalidating laws as unconstitutional, this Court's holdings voided statutes that established sex-offender registration for categories of offenders, *Betts*, 507 Mich 527; emergency powers for the executive, *In re Certified Questions from US Dist Court*, 506 Mich 332; and provisions for an independent committee to draw legislative maps, *In re Apportionment of State Legislature— 1982*, 413 Mich 96.

[31] MCL 408.414(2).

[32] 2018 PA 337, § 15(1) (Outside inapplicable exceptions, the initiative "shall supersede any acts or parts of acts inconsistent with or in conflict with this act, but only to the extent of such inconsistency or conflict.").

initiative, Michigan would retain a minimum wage. But the majority opinion does not consider this option. Nonetheless, it is abundantly clear from the substantive amendments of the statutory initiative proposal addressing minimum wage that the Legislature did not intend the action taken in the majority opinion: revival of the initiative provisions addressing minimum wage.

No analysis on the nuanced intent of the Legislature and the nature of the enactments is provided in the majority opinion. Instead of performing this challenging and necessary analysis, the Court takes an entirely different path, claiming that this issue is "relatively easy."[33] The Court voids the amendments passed by the Legislature and attempts to revive the adopted initiatives. But in so doing, the Court unambiguously rewrites the language of the statutes, in the asserted interests of the law's "purpose" and "equitable principles."[34]

That is not the legally recognized remedy of revival. When revival was used, predominantly in the late nineteenth and early twentieth centuries, the Court returned "the law of the State [to] *where it was before* [the amendatory law] was passed."[35] Nowhere in any of the foundational caselaw on the topic has this Court ever discussed, analyzed, or held that it could reshape and rewrite the revived statutes, whether in the interests of the Court's perception of "equity" or otherwise.[36] Unsurprisingly, the majority opinion fails to cite a single time in the

---

[33] *Ante* at 30 (opinion of the Court).

[34] *Ante* at 29-31 (opinion of the Court).

[35] *John Spry Lumber Co v Sault Savings Bank Loan & Trust Co*, 77 Mich 199, 202; 43 NW 778 (1889) (emphasis added).

[36] See, e.g., *Smith*, 246 Mich at 399 (reviving "Act No. 330, Pub. Acts 1925" with no condition, alteration, or judicially crafted rewrite); *McClellan v Judge of Recorder's Court of Detroit*, 229 Mich 203, 213; 201 NW 209 (1924) (same, reviving "all preceding laws upon that subject [gaming] in force").

14

history of our state when the Michigan Supreme Court has revived previously applicable law but, in so doing, has removed express language in that law and replaced it with new requirements and language that the Court deemed "equitable." Instead, the majority opinion cites totally inapt caselaw from the Supreme Court of the United States involving desegregation of schools established by Jim Crow era laws, *Brown v Bd of Ed of Topeka*, 349 US 294, 300; 75 S Ct 753; 99 L Ed 1083 (1955), and price control laws during World War II, *Hecht Co v Bowles*, 321 US 321, 329-330; 64 S Ct 587; 88 L Ed 754 (1944). Putting aside the fact that neither of those cases involved the rewriting of unambiguous statutes and therefore provide no legal support for the Court's positions,[37] their citation demonstrates an extraordinary misperception of the majority opinion's place in legal history, analogizing a rewrite of labor-market statutes in Michigan to the Supreme Court of the United States' attempts to eliminate systemic racial oppression.

Further, while performing its judicial role and providing interpretations on the validity and meaning of statutes, this Court has said in no uncertain terms that it has no authority to

---

[37] In fact, the majority opinion fails to explain that the quotation taken from *Hecht Co* was in the context of discussing the historical understanding of equitable powers *to issue an injunction*. The Court was asked to determine whether a statute abrogated the authority of a court to decline injunctive relief at its discretion. As the Court in *Hecht Co* accurately noted, when interpreting statutes, courts do not assume that the statute institutes "a major departure from . . . long tradition[s] . . . ." *Hecht Co*, 321 US at 330; see, e.g., *Velez v Tuma*, 492 Mich 1, 17; 821 NW2d 432 (2012) ("Further, a statute in derogation of the common law will not be construed to abrogate the common law by implication, but if there is any doubt, the statute is to be given the effect that makes the least change in the common law."). That is a basic principle of statutory interpretation that has nothing to do with judicial remedies for unconstitutional statutes, revival of previously rejected statutory language, or rewriting of unambiguous statutes. The seminal *Brown v Bd of Ed* decision involved the constitutional invalidity of segregated schools for black school children under the Equal Protection Clause. It had absolutely nothing to do with statutes, statutory interpretation, revival of previous statutes, or rewriting unambiguous language as new statutory law. The decision, and its import in the history of this country, is not remotely relevant to the case before the Court.

15

rewrite the unambiguous terms of a statute. It is a fundamental principle of law that the judicial branch cannot amend and replace the language of statutes; that power is "reserved solely to the Legislature."[38] Even if, in the words of the majority opinion, it might be "relatively easy" to rewrite statutes in order to devise a judicial remedy, that does not make the approach legally or constitutionally sound.

If the Court seeks to revive versions of statutes that have been rejected by the Legislature, it must revive those laws in full as they were written and passed by the legislative branch. This Court has no legal authority in our constitutional structure to take on the mantle of the legislative power and ameliorate the negative consequences of its otherwise flawed decision on the merits. Specifically, the language of the previous statute unambiguously stated that on "January 1, 2022," the "minimum hourly wage rate is . . . $12.00."[39] After that date, the minimum wage is

---

[38] *Johnson v Recca*, 492 Mich 169, 187; 821 NW2d 520 (2012); see also *Robertson v DaimlerChrysler Corp*, 465 Mich 732, 762; 641 NW2d 567 (2002) (explaining that the Michigan Supreme Court is "not entitled to usurp the prerogatives of the Legislature by altering the words of a statute to mean something other than what they plainly mean"); *Empire Iron Mining Partnership v Orhanen*, 455 Mich 410, 421; 565 NW2d 844 (1997) ("We will not judicially legislate by adding language to the statute."); *In re Certified Questions from US Dist Court*, 506 Mich at 356 (explaining that "rewrit[ing]" the unambiguous language of a statute conflicts with the constitutional delegation of the determination of laws "by the Legislature"); *Attorney General ex rel Connolly v Reading*, 268 Mich 224, 230; 256 NW 432 (1934) (explaining that "[w]e do not rewrite statutes" but instead apply standard principles of statutory construction); see also *Ayotte*, 546 US at 329 (reasoning that the judiciary's "constitutional mandate and institutional competence are limited," thus restraining the Court from " 'rewrit[ing]' " laws and performing "quintessentially legislative work") (citation omitted; alteration by the *Ayotte* Court); *Murphy*, 584 US at 481-482 (" '[W]e cannot rewrite a statute and give it an effect altogether different from that sought by the measure viewed as a whole.' "), quoting *R Retirement Bd v Alton R Co*, 295 US 330, 362; 55 S Ct 758; 79 L Ed 1468 (1935).

[39] 2018 PA 337, § 4(1).

16

increased annually "by the rate of inflation."[40]  Similarly, "beginning January 1, 2024 and thereafter," the minimum hourly wage rate for tipped labor "shall be 100% of the minimum hourly wage rate" applicable to nontipped labor.[41]

It is hard to imagine a more clear and explicit statement of law.  Yet the majority opinion wholesale discards the language and replaces it with its own highly convoluted formula to calculate wage rates, based primarily on the number of years passing after the date of today's decision.  Under the Court's rewrite of the statute, the designated increases in the minimum wage and gradual elimination of tipped-wage distinctions occur 205 days from the date of this Court's decision and, thereafter, every year from the date of today's decision.  However, the actual statutory language of the initiative makes no mention of any decision from this Court, nor does it discuss, mention, or rely upon a separation or passage of time following any identifiable event.  Instead, the initiative unambiguously states the *specific date and year* when *specific increases to the minimum wage* come into effect, e.g., on "January 1, 2022," the minimum wage "is" "$12.00."

Moreover, while the majority opinion abrogates the express language on the increases of the minimum wage, it apparently does not feel the need to abrogate the inflation provision, at least to a degree that is "equitable" in the eyes of four members of this Court.  Contrary to any indication in the legislative text, the majority opinion adds a court-devised inflation bonus on top of the express steps in minimum-wage increases.  The inflation charge is apparently calculated from 2019, i.e., the year of the first increase in the minimum wage without an inflation

---

[40] 2018 PA 337, § 4(2).

[41] 2018 PA 337, § 4d(2).

17

adjustment, to the date of the decision.[42] That would amount to around a $2.50 bonus. This inflation bonus is not calculated with a starting point of 2022, as was the inflation adjustment under the actual language of the initiative, nor is it adjusted year to year based on the "most recent 12-month period,"[43] as stated in the express terms of the law. Instead, the specific inflation bonus created by the Court's majority, calculated from the selective period between 2019 and today's decision, is added atop every step in the minimum wage as years pass into the future after this Court's decision. Notwithstanding the statutory text in the initiative to the contrary, no additional inflation adjustment on top of this inflation bonus occurs until 2029. The majority purportedly relies on the fact that the statute considered inflation in setting minimum wages beginning in 2022, but the majority considers inflation only between 2019 and today as opposed to annually from 2022 onward, superimposes this selective adjustment period onto provisions that expressly do not consider inflation, declines to follow similar unambiguous dates for raises in the minimum wage or elimination of tipped-wage distinctions, and then begins the inflation adjustment anew in 2029, a year not even mentioned in the initiative. In all, using its purported remedial power, the Court establishes an internally inconsistent and deeply confusing formula to set the rates of wages and tipped-labor distinctions going forward in this state for years. The chosen formulas are found nowhere in the text or plain meaning of the amended statutes, and there is no evidence from any source of law that the Legislature has ever endorsed

---

[42] *Ante* at 33 (opinion of the Court) (stating that "the $10.00 starting point that the Wage Act envisioned for 2019 is not the same as $10.00 in 2024"); *ante* at 34 n 23 (opinion of the Court) (using "July 31, 2024," as the "endpoint" for an inflation calculation).

[43] 2018 PA 337, § 4(2).

18

the method of minimum-wage calculation established by a thin four-member majority of this Court.

These amendments are downplayed as mere "dates and dollar amounts" in the majority opinion.[44] Of course, any individual's livelihood or small business can be reduced to a dollar figure or growth percentage. No one should be confused by what the majority opinion is doing. It applies "equity" to rewrite unambiguous statutory language and set new standards for wages and employment relations in the state of Michigan that have never been enacted by the Legislature or approved by the voters.

In refusing to apply plain statutory language, the Court might be rightfully concerned that its decision invalidating the amendatory statutes and reviving versions of the initiative statutes

---

[44] *Ante* at 34 n 25 (opinion of the Court).

The majority opinion also references in vague and cursory terms the judicial act of "adjusting dollar amounts to inflation[.]" *Ante* at 34 n 25 (opinion of the Court). This claim is not developed, and no caselaw citation or explanation is provided in support of the proposition. In addition, the majority opinion itself describes its remedy as a revival of previous versions of the statutes for the violation of the constitutional right to initiative, yet the revived statutes unambiguously contradict the Court's holding. See *ante* at 33, 34 (opinion of the Court) (stating that the remedy "revives" the prior versions and rewriting the inflation provisions "[i]n keeping with the statute's plan to begin accounting for inflation by 2022"); see also notes 35 and 36 of this opinion. Further, to the extent the present and future value of money is considered in court decisions, it is typically in the context of damages calculations for court judgments, which in Michigan are governed by statutes not court-created constitutional remedies. See *AFT v Michigan*, 334 Mich App 215, 226; 964 NW2d 113 (2020) ("[E]ntitlement to interest on a judgment is purely statutory and must be specifically authorized by statute.") (quotation marks and citation omitted); MCL 600.6013 (post-judgment interest); MCL 600.6455 (same); *Nation v WDE Electric Co*, 454 Mich 489; 563 NW2d 233 (1997) (explaining that MCL 600.6306 permits reduction of personal-injury damages for future noneconomic damages to present value). And here, the Court removes unambiguous statutory language and replaces it with novel and court-drafted statutory requirements as a constitutional remedy. No available case in the history of Michigan or this country has adopted, condoned, or supported such an approach. See also notes 38 and 45 of this opinion.

19

rejected by the Legislature might cause significant social and economic disruption. But the policy consequences of its decision are simply not a proper consideration of a Court exercising judicial restraint in wielding the judicial power and faithfully applying established law; rather, they are part of the policy considerations properly made by the Legislature.[45] This Court may not exercise legislative authority without any provision of such power in the Michigan Constitution.[46] Furthermore, if the Court believes the imposition of a revival remedy is so significant that the express statutory terms must be wholesale rewritten, that provides a strong indication that, in fact, the selected remedy contradicts the Legislature's intent, which is the ultimate guide of this Court's considerations for statutory remedies.

In sum, there is no indication that the Legislature intended the terms of the initiative to be revived in their entirety upon a finding by this Court that their subsequent amendments were unconstitutionally enacted. This being the case, principles of judicial restraint require the Court to simply declare as unconstitutional the legislative action of enacting into law an initiative pursuant to Const 1963, art 2, § 9 and amending the enacted initiative within the same legislative

---

[45] *Bauserman v Unemployment Ins Agency*, 509 Mich 673, 708; 983 NW2d 855 (2022) ("Weighing policy concerns is the work of other branches in crafting, if they choose, a different, albeit adequate, remedy for constitutional violations."); *Lash v Traverse City*, 479 Mich 180, 197; 735 NW2d 628 (2007) ("It is not within the authority of the judiciary to redetermine the Legislature's choice or to independently assess what would be most fair or just or best public policy.") (quotation marks and citation omitted); *Day-Brite Lighting, Inc v Missouri*, 342 US 421, 423; 72 S Ct 405; 96 L Ed 469 (1952) (explaining that judicial bodies "do not sit as a super-legislature to weigh the wisdom of legislation nor to decide whether the policy which it expresses offends the public welfare"); see also note 38 of this opinion (describing inherent limitations on the judicial branch that prohibit it from rewriting statutes).

[46] See Const 1963, art 3, § 2 ("No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution."); Const 1963, art 6, § 1 (vesting the "judicial power" in "one court of justice"); Const 1963, art 4, § 1 (vesting the "legislative power . . . in a senate and a house of representatives").

20

session.[47]  Having voided the unconstitutional law, the Court should then turn over to the people and their elected representatives the question of how best to remedy the legislative action declared unconstitutional by the Court.  Indeed, the Court's ruling has resolved the many policy choices in need of settlement by the democratic process.  In the present case, these policy choices relate to minimum wages, tipped wages, and earned sick time, and they affect not only the foundation of the employer–employee relationship but also the broader Michigan economy.  The people are free to once again launch an initiative effort to address these weighty issues.  In fact, citizens very nearly did exactly that within the current election cycle, but ultimately they were unsuccessful in their efforts due to deficiencies in the petitions circulated to gain access to the 2024 ballot.[48]  Further, the people are free to lobby their elected representatives to enact policies that might be similar to or diametrically opposed to those proposed in the Improved Workforce Opportunity Wage Act and the Earned Sick Time Act.  And, of course, the Legislature can at any time enact the policies it concludes best represent the values and desires of the people who elected them by exercising their constitutional authority to propose and pass legislation replacing the legislation declared unconstitutional today—something the Legislature has always had the power to do.  But this Court lacks the constitutional authority to enact legislation, let alone legislation never voted on by the people or passed by the Legislature.  The Court's actions to the

---

[47] Considering the Legislature's extensive alterations of the intricate systems of wages, benefits, and labor in the initiative, revival of the minimum-wage law in place before the initiative was enacted is supported by legislative intent.  See MCL 408.414.  Yet, the majority did not consider this revival option, deciding instead to revive and amend the initiative provisions addressing minimum wage that are clearly not supported by legislative intent.

[48] See *Raise the Wage MI v Bd of State Canvassers*, ___ Mich ___ (May 31, 2024) (Docket No. 166312) (denying the complaint for mandamus seeking access to the 2024 ballot).

21

contrary constitute an unprecedented overreach and expansion of raw judicial power not authorized in our Constitution.

While firmly of the belief that the most responsible and measured action for this Court is to simply return to the people and their elected representatives the policy choices nullified by the Court's declaration of unconstitutionality, I am compelled to comment further on the Court's chosen remedy, which it describes as a "modest use of judicial power . . . ."[49] Nothing about the Court's encroachment on the Legislature's constitutionally delegated power is "modest." To be clear, if the Court takes an exceedingly broad and expansive view of its remedial authority to invoke the judicial power, it should not do so by brazenly exercising legislative power to rewrite statutes in a manner unprecedented in Michigan or the United States. If a majority of this Court is insistent on taking an exceedingly broad and expansive view of its authority, it should instead take the more measured approach of placing the proposed initiative up for consideration by the voters of Michigan. Imbued throughout the analysis of the majority opinion is a purported interest in vindicating the rights of the people to direct democracy and preventing subversion by the Legislature, so as to allow citizens to make significant policy decisions themselves at the ballot box. Yet the only individuals who have indicated any support for the initiated laws are the distinct minority of citizens who signed a petition to begin the initiative process. Although the Legislature adopted the initiated law, it expressly rejected the policies of the proposed initiative when it discarded significant portions of the initiative as written and replaced them with materially different provisions. Furthermore, no citizen of this state has voted in an election in favor of the initiative proposal. And no one—not even the initiative signatories—has

---

[49] *Ante* at 34 n 25.

22

indicated any sign of support for the statutory language as rewritten by a majority of this Court. The initiative proposal and the statute as amended by the Court have received no endorsement from the established democratic mechanisms of this state, whether through popular vote or elected representatives.

Given the significant constitutional, historical, and caselaw support for the legality of the Legislature's amendments in this case, the Court's analysis on the merits constitutes a decisive shift in the law of this state. The Court implicitly recognizes this when it applies its decision only prospectively to employers who could otherwise be held liable for underpayment of wages and benefits.[50] Applying this extensive remedial authority contemplated in the majority opinion, the Court could instead recognize these unique circumstances of the legislative amendments at issue, the significant policy changes implicated, and the major change in the direction of constitutional law embodied in the majority opinion. Under the state of the law at the time, the Legislature could very reasonably have believed that amendment of an adopted initiative within the "same legislative session," like all amendments of adopted initiatives, was constitutionally permissible. While the Court could simply let the amended statutes stand as enacted law,[51] a legal approach preferable to the approach taken by the majority would be to construe the Legislature's substantial amendment and replacement of the initiative's provisions as a rejection of that initiative proposal. Therefore, the Court could interpret the amendment as ineffective as

---

[50] Compare *League of Women Voters of Mich v Secretary of State*, 508 Mich 520, 566; 975 NW2d 840 (2022) (holding that the Court's decision in the case amounted to a new rule of law because "while no precedent is being overruled, this is an issue of first impression that has been subject to vigorous debate essentially since 2018 PA 608 was enacted").

[51] Like the Court applies its decision prospectively as to employers, it could do the same for the Legislature. Certainly, the Legislature has been empowered to amend the substance of the pertinent laws consistent with the changes imposed by this Court, yet it has not done so.

a matter of statutory law, and the initiative proposal would then be placed on the ballot as if the Legislature had chosen not to adopt it.[52] In so doing, the voters of the state would have their constitutional rights to direct democracy vindicated, deciding for themselves the significant questions of economic and social policy implicated in the initiative proposal. It would also vindicate legislative intent by rejecting any suggestion that the language of the initiative proposal was the adopted policy of the Legislature, which it clearly ceased to be once the Legislature amended the statutes.[53] Allowing an initiative proposal rejected by the Legislature to be decided

---

[52] Generally, the Legislature rejects an initiative petition "within 40 session days from the time such petition is received by the legislature." Const 1963, art 2, § 9. However, given the highly unusual circumstances of this case, where the Court is declaring a major realignment of understood constitutional law and where the Legislature unambiguously rejected the initiative language, the broad remedial authority envisioned in the majority opinion would undoubtedly support placing the issue on the ballot as an initiative proposal rejected by the Legislature. The remedy is constitutionally tailored to the highly unusual circumstances of this case, involves no abrogation of legislative authority, and vindicates the rights of direct democracy, unlike the remedy selected by the majority opinion.

[53] Although applying a constitutional provision with different language, the Washington Supreme Court adopted this exact remedy when it also held that intrasession adopt-and-amend was constitutionally impermissible. The provision in the Washington Constitution establishing the initiative required that the initiative proposal be " 'enacted or rejected without change or amendment by the legislature before the end of such regular session.' " *Eyman v Wyman*, 191 Wash 2d 581, 615; 424 P3d 1183 (2018) (en banc) (Madsen, J., concurring in part and dissenting in part) (setting out the remedy of the decision and quoting Wash Const, art 2, § 1(a)) (emphasis omitted). By contrast, the Michigan Constitution requires that the initiative proposal be "either enacted or rejected by the legislature without change or amendment *within 40 session days* from the time such petition is received by the legislature." Const 1963, art 2, § 9 (emphasis added). The amendments at issue here were passed more than 40 days after the proposal was received by the Legislature. Therefore, the constitutional infirmities with the amendment identified in the Washington Supreme Court decision are not present in the instant case.

24

by the voters is a process permitted by the Michigan Constitution.[54]  A judicial rewrite of unambiguous statutes in the name of "equity" is not.

The majority opinion implies that its unprecedented remedy can be justified because a similar case has never previously come before the Court.[55]  Simply because a case presents a constitutional dispute of first impression does not give the Court authority to violate basic principles of the judicial role, ignore long-established law on statutory remedy, or usurp the power assigned to the Legislature in contravention of the separation of powers under the Michigan Constitution.[56]

## II. CONCLUSION

After declaring that the Legislature's amendments were improper, the Court could revive previous versions of the statutes or decline revival.  However, if the Court chooses to revive previously removed provisions, it must revive those provisions in full and in accordance with their plain and unambiguous language.  What this Court may not do is revive portions of statutes, judicially excise express language in the statutes, and interpose new legal requirements and

---

[54] Const 1963, art 2, § 9 (when an initiative proposal is rejected, "the state officer authorized by law shall submit such proposed law to the people for approval or rejection at the next general election").

[55] *Ante* at 34 n 25 (opinion of the Court) ("We observe, however, that the Legislature's decision to adopt and amend was an unprecedented and unconstitutional act.").

[56] Compare, e.g., *Betts*, 507 Mich at 567-574 (reviewing for the first time the constitutionality of a sex-offender-registry statute and holding the statute to be unconstitutional); *In re Certified Questions from US Dist Court*, 506 Mich 332 (considering for the first time the constitutionality of a statute providing the Governor emergency powers, in the context of the historic COVID-19 pandemic, and declaring the statute to be unconstitutional); *Blank v Dep't of Corrections*, 462 Mich 103; 611 NW2d 530 (2000) (analyzing the constitutionality of a legislative-veto statute for the first time and holding the statute to be unconstitutional).

language found nowhere in either the initiative proposal or the amendments, guided solely by the Court's perception of "equitable" results. As a result, the proper and most appropriate remedy available to this Court once it has declared unconstitutional the action of adopting and amending an initiative in the same legislative session is to return the question to the people and their elected representatives to resolve the policy questions voided by this Court's decree.[57]

But if the Court's majority is headstrong on exercising broad and unprecedented remedial powers, the Court should proceed with extreme caution and great restraint and avoid encroaching on the powers constitutionally delegated to the Legislature. Accordingly, rather than writing legislation never before proposed or considered by the Legislature, the Court could construe the Legislature's substantial rejection of the initial statutory language as a rejection of the initiative proposal. In so doing, the Court should account for the reality that there was significant legal support for the adopt-and-amend procedure and that the majority opinion's prohibition on amendments, tailored solely to those amendments within the "same legislative session," constitutes a marked shift in the law. That would support placing the initiative proposal on the ballot for the citizens of this state to decide for themselves the weighty socioeconomic issues at play in a proper exercise of direct democracy, in line with the structure, design, and interests of the Michigan Constitution's initiative provisions that the Court claims to vindicate.[58] It would

---

[57] Michigan would have a minimum wage in that event. In accordance with the intent of the Legislature, the minimum-wage law in effect prior to the initiative would apply. See MCL 408.414.

[58] If, as the concurrence agrees, the Court has the authority to take the extraordinary step of rewriting unambiguous language of statutes, a power constitutionally reserved to the Legislature, it is hard to see why this Court would be barred from placing the initiative proposal on the general-election ballot. The Court can readily construe the rejection of the initiative proposal as effective starting the day of this Court's decision. Compare, e.g., *ante* at 33 n 22 (opinion of the

26

also demonstrate fidelity to legislative intent by declining to bring into effect as a matter of legislative enactment statutory language that was expressly rejected by the Legislature.

Instead, in today's decision, the Court adopts as the employment law of this state statutory language that was neither approved by the Legislature nor voted on by the people. In fact, by rewriting entire swaths of the relevant statutory language, the Court enacts statewide policy that was not even included in the first initiative proposed by a small minority of Michigan residents. The Court is not vindicating the people's "rights to direct democracy,"[59] nor is it respecting the

_____

Court) (ordering the state treasurer to "publish [inflation] amounts 'by November 1 of the year it is calculated and shall be effective beginning' 205 days after this opinion's publication," notwithstanding express and contradictory statutory language), quoting 2018 PA 337, § 4(2), with *Promote the Vote 2022 v Bd of State Canvassers*, 510 Mich 884, 884 (2022) (directing "the Board of State Canvassers . . . to certify [a petition to amend the Michigan Constitution] as sufficient for placement on the November 8 general election ballot by September 9, 2022"), and *Reproductive Freedom for All v Bd of State Canvassers*, 510 Mich 894, 894 (2022) (same). Of course, the Legislature may reject initiative proposals at any time of year and well before the next general election. The established processes for placement on the general-election ballot would govern. There is no indication in the election statutes or the Michigan Constitution that an initiative rejected by the Legislature but not approved by the citizenry would be barred from general-election consideration simply because requirements for newly initiated proposals were added after the prior initiative was rejected. See, e.g., MCL 168.480, as amended by 2012 PA 276 (effective August 16, 2012, and describing the procedures for placing a question on the ballot); Const 1963, art 2, § 9 (upon rejection "the state officer authorized by law *shall submit* such proposed law to the people for approval or rejection at the next general election") (emphasis added). Contrary to the concurrence's suggestion, it is highly questionable whether a new statutory enactment or an act of the Board of State Canvassers would even be permitted to retroactively cut off petitioners' constitutional rights to place a rejected initiative on the ballot. *Ante* at 4 (BOLDEN, J., concurring) (noting concerns that the initiatives at issue might not comply with requirements in place for initiatives advanced today); see *Buhl v Oak Park*, 507 Mich 236, 246; 968 NW2d 348 (2021) ("[A] statute or amendment may not be applied retroactively if doing so would take away or impair vested rights acquired under existing laws, or create a new obligation and impose a new duty, or attach a new disability with respect to transactions or considerations already past.") (quotation marks, citation, and brackets omitted).

[59] *Ante* at 27 (opinion of the Court).

proper role of "the Legislature's lawmaking power,"[60] as it claims. It is replacing those powers with its own. The chosen remedy expressed in the majority opinion and the Court's choice to exercise legislative power by rewriting statutory language find no support in the Michigan Constitution, or in the history, tradition, or caselaw of this state or this country. Therefore, I dissent.

Brian K. Zahra
Elizabeth T. Clement
David F. Viviano

---

[60] *Ante* at 25 (opinion of the Court).